# CALIFORNIA ET AL. *v.* GRACE BRETHREN CHURCH ET AL.

No. 81–31.   Argued March 30, 1982—Decided June 18, 1982*

---

*Together with No. 81–228, *United States et al.* v. *Grace Brethren Church et al.;* and No. 81–455, *Grace Brethren Church et al.* v. *United States et al.*, also on appeal from the same court.

394

O'CONNOR, J., delivered the opinion of the Court, in which BURGER, C. J., and BRENNAN, WHITE, MARSHALL, POWELL, and REHNQUIST, JJ., joined. STEVENS, J., filed a dissenting opinion, in which BLACKMUN, J., joined, *post*, p. 419.

*Harriet S. Shapiro* argued the cause for the United States et al. in Nos. 81–228 and 81–455. With her on the briefs were *Solicitor General Lee, Assistant Attorney General McGrath, Deputy Solicitor General Wallace, Mark C. Rutznick,* and *F. James Foley.*

*Jeffrey M. Vesely,* Deputy Attorney General of California, argued the cause for appellants in No. 81–31. With him on the briefs were *George Deukmejian,* Attorney General, and *Edmond B. Mamer,* Deputy Attorney General.

*William Bentley Ball* argued the cause for appellees in Nos. 81–31 and 81–228 and appellants in No. 81–455. With him on the brief for Grace Brethren Church et al. were *Philip J. Murren* and *Robert L. Toms. Donald A. Daucher* filed a brief for the Lutheran Church-Missouri Synod et al.†

---

†*Nathan Z. Dershowitz* and *Marc D. Stern* filed a brief for the American Jewish Congress as *amicus curiae.*

JUSTICE O'CONNOR delivered the opinion of the Court.

The principal question presented by the parties to these appeals is whether certain state and federal statutes violate the Establishment and Free Exercise Clauses of the First Amendment[1] by requiring religious schools unaffiliated with any church to pay unemployment insurance taxes. We do not reach this substantive question, however, holding instead that the Tax Injunction Act, 28 U. S. C. § 1341,[2] deprived the District Court of jurisdiction to hear these challenges. Accordingly, we vacate the judgment below.

## I

Last Term, in *St. Martin Evangelical Lutheran Church* v. *South Dakota*, 451 U. S. 772 (1981), this Court considered statutory and constitutional challenges to provisions of the Federal Unemployment Tax Act (FUTA), 26 U. S. C. §§ 3301–3311 (1976 ed. and Supp. IV). Because the present claims involve the same provisions that we interpreted in *St. Martin*, we recount only briefly the substance and legislative history of the relevant statutes before turning to the facts in the present cases.

## A

In FUTA,[3] Congress has authorized a cooperative federal-state scheme to provide benefits to unemployed workers.

---

[1] The First Amendment provides in pertinent part that "Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof." The Free Exercise and Establishment Clauses apply to the States through the Due Process Clause of the Fourteenth Amendment. See *Cantwell* v. *Connecticut*, 310 U. S. 296, 303 (1940); *Everson* v. *Board of Education*, 330 U. S. 1, 15 (1947).

[2] The Act provides:

"The district courts shall not enjoin, suspend or restrain the assessment, levy or collection of any tax under State law where a plain, speedy and efficient remedy may be had in the courts of such State."

[3] FUTA was enacted originally as Title IX of the Social Security Act of 1935, ch. 531, 49 Stat. 639.

The Act requires employers to pay an excise tax on wages paid to employees in "covered" employment,[4] but entitles them to a credit of up to 90% of the federal tax for contributions they have paid into federally approved state unemployment compensation programs.[5] One of the requirements for federal approval is that state programs "cover" certain broad categories of employment.

Until 1970, 26 U. S. C. § 3306(c)(8) excluded from the definition of covered employment "service performed in the employ of a religious, charitable, educational, or other [tax exempt] organization." Pub. L. 86–778, § 533, 74 Stat. 984. As a consequence, such organizations were not required to pay either federal excise taxes or state unemployment compensation taxes. In 1970, Congress amended FUTA to require state plans to cover employees of nonprofit organizations, state hospitals, and state institutions of higher education, thus eliminating the broad exemption available to nonprofit organizations.[6] See § 3309(a)(1). At the same time, Congress enacted § 3309(b) to exempt from mandatory

---

[4] See 26 U. S. C. § 3301.

[5] See 26 U. S. C. § 3302 (1976 ed. and Supp. IV). Each state program receives annual approval after the Secretary of Labor finds that it complies with federal statutory standards. See 26 U. S. C. §§ 3304(a), (c) (1976 ed. and Supp. IV). The federal standards for the state programs are contained in §§ 3304 and 3309. If a state plan complies with federal standards, the State is authorized to receive a federal grant to administer the state plan. See 29 U. S. C. § 49d(b); 42 U. S. C. § 501.

[6] See Employment Security Amendments of 1970, Pub. L. 91–373, § 104 (b)(1), 84 Stat. 697. Under §§ 3309(a)(2) and 3304(a)(6)(B), such nonprofit organizations were given the option of either making the same contribution to the state unemployment compensation fund required of other employers, or reimbursing the fund for unemployment compensation payments actually made to the nonprofit organizations' former employees.

Although nonprofit organizations were covered by federally approved state unemployment compensation laws, they continued to be exempt from the federal excise tax on wages because the definition of "employment" in § 3306(c)(8), excluding services performed for such organizations, remained unchanged.

state coverage a narrow class of religious and educational employees, *i. e.,* Congress exempted services performed

> "(1) in the employ of (A) a church or convention or association of churches, or (B) an organization which is operated primarily for religious purposes and which is operated, supervised, controlled, or principally supported by a church or convention or association of churches;
>
> "(2) by a duly ordained, commissioned, or licensed minister of a church in the exercise of his ministry or by a member of a religious order in the exercise of duties required by such order;
>
> "(3) in the employ of a school which is not an institution of higher education."   Pub. L. 91–373, § 104(b)(1), 84 Stat. 698.

In 1976, Congress again amended FUTA, this time eliminating the substance of § 3309(b)(3), thereby removing the blanket exemption for school employees.   See Unemployment Compensation Amendments of 1976, Pub. L. 94–566, § 115(b)(1), 90 Stat. 2670.[7]   In order to maintain compliance with FUTA, the States promptly amended their corresponding state programs.   See, *e. g.,* Cal. Un. Ins. Code Ann. §§ 634.5(a), (b) (West Supp. 1982).

### B

The plaintiffs in these cases, a number of California churches and religious schools, sought to enjoin the Secretary of Labor from conditioning his approval of the California unemployment insurance program on its coverage of the plaintiffs' employees, and to enjoin the State from collecting both tax information and the state tax.[8]   For the purposes of

---

[7] In its place, Congress substituted an unrelated provision.

[8] This litigation grew out of two suits, one filed in the District Court by Grace Brethren Church et al. (Case No. CV 79–93 MRP), and the other filed in state court by the Lutheran Church Missouri Synod.   The Secre-

evaluating their statutory and constitutional claims, the District Court divided the plaintiffs into three classes of employers: Category I represents those schools that are part of the corporate structure of a church or association of churches; Category II includes schools that are separate corporations formed by a church or association of churches; and Category III includes schools that are "operated primarily for religious purposes, but which [are] not operated, supervised, controlled or principally supported by a church or convention or association of churches, i. e., an independent, non-church affiliated religious school." Supplemental Opinion, reprinted in App. to Juris. Statement in No. 81–31, p. 71 (J. S. App.).[9]

On September 21, 1979, the District Court granted a preliminary injunction against the State, restraining it from collecting the state unemployment tax from the Category I plaintiffs. See id., at 51. The basis for the court's order was its conclusion that the plaintiffs were exempt from mandatory state coverage under § 3309(b)(1), and alternatively, that if they were not exempt under the terms of FUTA, collection of the tax from the plaintiffs would involve excessive governmental entanglement with religion, in violation of the Establishment Clause of the First Amendment. See J. S. App. 58–65.

In the same opinion, the District Court rejected the Federal Government's argument that, because the state remedy was "plain, speedy and efficient," the Tax Injunction Act, 28 U. S. C. § 1341, barred the court from granting injunctive relief. Considering first the availability of injunctive relief

---

tary of Labor successfully removed the *Lutheran Church* case (Case No. CV 79–162 MRP) to the District Court, which consolidated the cases for trial.

[9] Category I and II schools comprise schools from the *Lutheran Church* case, see Order (filed Apr. 3, 1981), reprinted in J. S. App. 49, as well as some of the schools from the *Grace Brethren* case. See Order (filed Apr. 3, 1981), reprinted in J. S. App. 45. Category III schools include only schools from the *Grace Brethren* case. See J. S. App. 46.

from the state courts, the court concluded that state statutory and constitutional provisions [10] made such relief "at best,

---

[10] California Un. Ins. Code Ann. § 1851 (West 1972) provides:

"No injunction or writ of mandate or other legal or equitable process shall issue in any suit, action or proceeding, in any court against this State or against any officer thereof to prevent or enjoin the collection of any contribution sought to be collected under this division."

California Const., Art. XIII, § 32, provides:

"No legal or equitable process shall issue in any proceeding in any court against this State or any officer thereof to prevent or enjoin the collection of any tax. After payment of a tax claimed to be illegal, an action may be maintained to recover the tax paid, with interest, in such manner as may be provided by the Legislature."

Despite the apparently unambiguous language of these provisions, the District Court considered the availability of injunctive relief only "uncertain" because of state decisions indicating that injunctive relief may be available when the plaintiff challenges the state tax law as being unconstitutional. See *Las Animas & San Joaquin Land Co.* v. *Preciado*, 167 Cal. 580, 587, 140 P. 239, 242 (1914) (injunction available to restrain a school district from assessing property taxes on land over which it has no authority); *Bueneman* v. *City of Santa Barbara*, 8 Cal. 2d 405, 407, 65 P. 2d 884, 886 (1937) (statutory provision precluding courts from enjoining execution of public laws for public benefit does not apply to claims that a taxing statute is unconstitutional).

More recent decisions, however, have held injunctive relief to be precluded. See *Modern Barber Colleges, Inc.* v. *California Employment Stabilization Comm'n*, 31 Cal. 2d 720, 723, 192 P. 2d 916, 918 (1948) (holding that a provision in the Unemployment Insurance Act, similar to § 1851, prohibited injunctive relief, leaving the taxpayer only with the option to pay the tax and seek a refund); *Aronoff* v. *Franchise Tax Board*, 60 Cal. 2d 177, 180, 383 P. 2d 409, 411 (1963) (holding that Cal. Const., Art. XIII, § 15, and Cal. Rev. & Tax Code Ann. § 19081 (West 1970) preclude issuance of an injunction to prevent collection of additional income taxes). Relying on *Aronoff*, a District Court of Appeal held that Cal. Const., Art. XIII, § 32 (which, in 1974, became the successor to § 15), and the corresponding statutory provision, Cal. Un. Ins. Code Ann. § 1851 (West 1972), prohibit the courts from enjoining the collection of unemployment insurance taxes. *Lorco Properties, Inc.* v. *Department of Benefit Payments*, 57 Cal. App. 3d 809, 815, 129 Cal. Rptr. 312, 315 (1976). Recently, in *Pacific Gas & Electric Co.* v. *State Board of Equalization*, 27 Cal. 3d 277, 279, 611 P. 2d 463, 464 (1980), the California Supreme Court held that under Cal. Const., Art. XIII, § 32, a taxpayer was barred from seeking relief compelling the

uncertain." J. S. App. 66. The court then concluded that a state suit for a refund was an inadequate remedy because the plaintiffs claimed not only that their property had been taken unlawfully, but also that the "very process of determining whether any tax is due at all results in a violation of their First Amendment rights." *Id.*, at 67. Because this First Amendment injury was "irreparable" once the taxes had been collected, only an injunction against collection of the tax could remedy the plaintiffs' claims. Accordingly, because there existed no "plain, speedy and efficient" remedy in the state courts, the District Court concluded that it had jurisdiction to grant injunctive and declaratory relief.

In a supplemental opinion filed June 2, 1980, the court clarified its earlier opinion, stating expressly that the preliminary injunction covered only Category I plaintiffs. See *id.*, at 71. For the same reasons that it had granted the initial preliminary injunction, however, the court extended the preliminary injunction to Category II plaintiffs. The court continued to deny relief to the Category III plaintiffs after concluding that they were not covered by the statutory exemptions in § 3309(b) and that the risk of excessive governmental entanglement with religion was too small to violate the Establishment Clause. J. S. App. 77–79.[11]

---

state tax board to adjust the taxpayer's real property assessments. The court expressly held that there were no equitable exceptions to this rule, *id.*, at 282, 611 P. 2d, at 466, and reaffirmed the importance of the state policy to permit the uninterrupted collection of taxes. Cf. *Pacific Motor Transport Co.* v. *State Board of Equalization*, 28 Cal. App. 3d 230, 236, 104 Cal. Rptr. 558, 562 (1972) (noted without approval in *Pacific Gas & Electric Co.* v. *State Board of Equalization, supra*, and holding that a taxpayer could seek declaratory relief to challenge the validity of a tax regulation, but that such relief could not "'prevent or enjoin' or otherwise hamper present or future tax assessment or collection effort").

[11] The court also rejected the arguments offered by the Category III plaintiffs that imposition of the tax violates the Free Exercise Clause, and that the unique statutory treatment of Category III plaintiffs violates equal protection. J. S. App. 78.

Finally, on April 3, 1981, the court filed a second supplemental opinion ruling on all of the plaintiffs' motions for permanent injunctions enjoining the State from collecting unemployment compensation taxes and the Federal Government from conditioning approval of the state unemployment compensation programs on their inclusion of the plaintiffs' employees. See *id.*, at 1. Considering first the statutory claims, the court concluded that Category I and Category II schools, but not Category III schools, are exempt from coverage under 26 U. S. C. § 3309(b) and the corresponding state provision, Cal. Un. Ins. Code Ann. § 634.5(a) (West Supp. 1982). J. S. App. 3–15.[12] The court also found that the benefit entitlement decisions for employees of Category III schools risk excessive governmental entanglement with religion in violation of the Establishment Clause of the First Amendment. *Id.*, at 25–33.[13] Consequently, the court held that "constitutional considerations bar the application of the scheme" to the Category III plaintiffs. *Id.*, at 33.

Based on these findings, the court issued orders permanently enjoining the federal defendants from requiring state unemployment insurance programs to cover Category I and Category II schools as a precondition for federal approval of the state programs, *id.*, at 47, 51, and permanently enjoining

---

[12] The court held alternatively that if the Secretary of Labor's interpretation of § 3309(b) were correct (*i. e.*, Category I and II schools were not exempt from coverage), then that provision violated the First Amendment because it caused excessive governmental entanglement with religion by requiring "[i]ntrusive monitoring of the activities of employees of religious schools in order to determine whether or not those employees are exempt from unemployment insurance . . . taxes" and by requiring "[i]nvolvement of state officials in the resolution of questions of religious doctrine in the course of determining the benefit eligibility of discharged employees of religious schools." Order (filed Apr. 3, 1981), reprinted in J. S. App. 45, 46; Order (filed Apr. 3, 1981), reprinted in *id.*, at 49, 50.

[13] The court again rejected the plaintiffs' argument that statutory coverage of Category III schools violates the Free Exercise Clause of the First Amendment, *id.*, at 16–25, and found it unnecessary to reach the Category III plaintiffs' equal protection claim. *Id.*, at 35.

the state defendants from "collecting, or attempting to collect, unemployment compensation . . . taxes" from the Category I, II, or III schools. *Id.*, at 47, 50. The court expressly held Cal. Un. Ins. Code Ann. § 634.5(a) (West Supp. 1982) unconstitutional. See J. S. App. 45, 46. The court did not issue an injunction against the federal defendants as to Category III schools because it

> "has no information indicating what response, if any, the Secretary will make to the Court's conclusion that the state defendants may not constitutionally impose the state unemployment compensation tax scheme on the Category 3 employees of non-church affiliated schools. . . . If the Secretary, in response to failure by the state defendants to collect unemployment compensation taxes on behalf of Category 3 employees, institutes decertification proceedings against the State of California, the parties may apply to this Court for further relief." Second Supplemental Opinion, reprinted in J. S. App. 44, n. 39.

Following issuance of the court's injunction, this Court decided *St. Martin Evangelical Lutheran Church* v. *South Dakota*, holding that § 3309(b)(1)(A) exempts Category I schools from mandatory coverage under the state unemployment insurance programs. Although no Category II schools were before the Court in *St. Martin*, the Court noted in a footnote that

> "[t]o establish exemption from FUTA, a separately incorporated church school (or other organization) must satisfy the requirements of § 3309(b)(1)(B): (1) that the organization 'is operated primarily for religious purposes,' and (2) that it is 'operated, supervised, controlled, or principally supported by a church or convention or association of churches.'" 451 U. S., at 782–783, n. 12.

As a result of this opinion, the Secretary of Labor reconsidered his position and decided that both Category I and Cate-

gory II schools are statutorily exempt from mandatory coverage under FUTA. Consequently, the federal defendants, as well as the state defendants, have not appealed the District Court's injunction involving Category I and Category II schools, but only that part of the District Court order involving the Category III schools.[14]

## II

An initial matter requiring our attention is whether this Court has jurisdiction to hear these appeals.[15] Congress has provided that

"[a]ny party may appeal to the Supreme Court from an interlocutory or final judgment, decree or order of any court of the United States . . . holding an Act of Congress unconstitutional in any civil action, suit, or proceeding to which the United States or any of its agencies, or any officer or employee thereof, as such officer or employee, is a party." 28 U. S. C. § 1252.

---

[14] See J. S. App. 11–12; Juris. Statement in No. 81–228, pp. 4, n. 2, 6, n. 5. The Category III schools are parties only in the *Grace Brethren* case, the suit originally filed in federal court. See n. 8, *supra*.

The *Grace Brethren* appellees filed a cross-appeal (No. 81–455) claiming that the District Court erred in holding that FUTA and the corresponding California statutory provisions do not violate the Free Exercise Clause of the First Amendment. The cross-appeal, however, is unnecessary to preserve this argument since under this Court's Rule 10.5 "an appellee, without filing a cross-appeal, [may] defend a judgment on any ground that the law and record permit and that would not expand the relief he has been granted."

The plaintiffs in the *Lutheran Church* case have filed a brief in support of the judgment below. Because, however, neither the State nor the Federal Government appealed from that part of the judgment involving the *Lutheran Church* plaintiffs, we do not address their claims.

[15] In our order setting these cases for oral argument, we postponed the question of jurisdiction until consideration of the merits. See 454 U. S. 961 (1981).

The only possible doubt regarding our appellate jurisdiction under this provision is the requirement that the District Court hold "an Act of Congress unconstitutional."

In *McLucas* v. *DeChamplain*, 421 U. S. 21 (1975), we stated that § 1252 was an unambiguous exception to the policy of minimizing the mandatory docket of this Court. Indeed, the "language of the statute sufficiently demonstrates its purpose: to afford immediate review in this Court in civil actions to which the United States or its officers are parties and thus will be bound by a holding of unconstitutionality." *Id.*, at 31. Moreover, this Court has appellate jurisdiction under § 1252 "when the ruling of unconstitutionality is made in the application of the statute to a particular circumstance, . . . rather than upon the challenged statute as a whole." *Fleming* v. *Rhodes*, 331 U. S. 100, 102–103 (1947) (discussing the predecessor to § 1252, Act of Aug. 24, 1937, 50 Stat. 751). See *United States* v. *Christian Echoes National Ministry, Inc.*, 404 U. S. 561, 563 (1972) *(per curiam); United States* v. *Darusmont*, 449 U. S. 292, 293 (1981). Finally, § 1252 provides jurisdiction even though the lower court did not expressly declare a federal statute unconstitutional, so long as a determination that a statutory provision was unconstitutional "was a necessary predicate to the relief" that the lower court granted. *United States* v. *Clark*, 445 U. S. 23, 26, n. 2 (1980).[16]

In the present case, the District Court did not expressly hold § 3309(b) of FUTA unconstitutional as applied to the Category III appellees,[17] but the effect of its several opinions

---

[16] In *Clark*, the Court of Claims simply ordered relief based on its earlier decision in another case. In that earlier decision, the court had declared the challenged statutory provision unconstitutional. See *Gentry* v. *United States*, 212 Ct. Cl. 1, 546 F. 2d 343 (1976), rehearing denied, 212 Ct. Cl. 27, 551 F. 2d 852 (1977).

[17] See Order (filed Apr. 3, 1981), reprinted in J. S. App. 45, 46 (holding Cal. Un. Ins. Code Ann. § 634.5(a) (West Supp. 1982) unconstitutional, but making no direct reference to § 3309(b)).

and orders was to make "the United States or its officers . . . bound by a holding of unconstitutionality." *McLucas* v. *DeChamplain, supra,* at 31. For example, while discussing the Establishment Clause claim of the Category III schools, the District Court held:

> "Since such entanglement [involving the resolution of questions of faith and doctrine by secular tribunals] is inevitable during the benefit eligibility determination process if religious schools are brought within the scope of the unemployment compensation tax *scheme,* constitutional considerations bar the *application of the scheme* to them." Second Supplemental Opinion, reprinted in J. S. App. 33 (emphasis added).

Examination of other portions of the court's opinion makes clear that the court's use of the word "scheme" refers to the combined federal and state provisions. See, *e. g., id.,* at 26 (expressly referring to both federal and state statutory provisions in discussing the "unemployment compensation scheme"); *id.,* at 25 (referring to the intent of Congress and the California Legislature in discussing the "unemployment compensation tax scheme"). Moreover, the District Court's analysis leading to its order holding the California provision unconstitutional is based solely on its understanding of the operation and effect of FUTA, which of course prompted the passage of the corresponding state statute in the first place.[18]

---

[18] The court's analysis of Category I and II schools also demonstrates that it believed FUTA, as applied to Category III schools, to be unconstitutional. In its discussion of Category I and II schools, the court held that if it were to follow the Secretary's interpretation of § 3309, *i. e.,* if *no* exemption existed, then FUTA would be unconstitutional as applied to those schools in part because of the excessive governmental entanglement in the benefit eligibility hearing. See n. 12, *supra.* Since the court also found an entanglement problem with respect to benefit eligibility hearings for Category III schools, and since there is no statutory exemption for those schools, it follows that the District Court must have believed that FUTA was unconstitutional as applied to the Category III plaintiffs.

Cf. *St. Martin Evangelical Lutheran Church* v. *South Dakota*, 451 U. S., at 780, n. 9 (holding that the Court could review the South Dakota Supreme Court's interpretation of its unemployment compensation tax statute because its "analysis depended entirely on its understanding of the meaning of FUTA and the First Amendment"). Finally, in its second supplemental opinion, the court made clear that if the Secretary "institutes decertification proceedings against the State of California" for failing to collect unemployment compensation taxes on behalf of Category III employees, "the parties may apply to this Court for further relief," which can only mean injunctive relief against the Secretary. J. S. App. 44, n. 39. Under these circumstances, it is clear that the Secretary is "bound by a holding of unconstitutionality," and that this Court has jurisdiction under § 1252 to hear this appeal.

## III

As we noted above, the District Court declared Cal. Un. Ins. Code Ann. § 634.5(a) (West Supp. 1982) unconstitutional and enjoined the state defendants from collecting state unemployment compensation taxes from the Category III schools.[19] In the course of granting this declaratory and injunctive relief, the court expressly rejected the Federal Government's argument that the Tax Injunction Act, 28 U. S. C. § 1341, deprived the court of jurisdiction. See J. S. App. 65–69. Consequently, before reaching the merits of the appellees' claim, we must decide whether the District Court correctly ruled that it had jurisdiction under the Tax Injunction Act to issue declaratory and injunctive relief.

## A

The Tax Injunction Act states simply that the district courts "shall not enjoin, suspend or restrain the . . . col-

---

[19] No federal tax is involved in this case, for the services performed for Category III schools are exempted by § 3306(c)(8) from the definition of employment for which the federal excise tax must be paid.

lection of any tax under State law where a plain, speedy and efficient remedy may be had in the courts of such State." It is plain from this language that the Tax Injunction Act prohibits a federal district court, in most circumstances, from issuing an injunction enjoining the collection of state taxes. Although this Court once reserved the question,[20] we now conclude that the Act also prohibits a district court from issuing a declaratory judgment holding state tax laws unconstitutional.

Initially, we observe that the Act divests the district court not only of jurisdiction to issue an injunction enjoining state officials, but also of jurisdiction to take actions that "suspend or restrain" the assessment and collection of state taxes. Because the declaratory judgment "procedure may in every practical sense operate to suspend collection of the state taxes until the litigation is ended," *Great Lakes Dredge & Dock Co.* v. *Huffman,* 319 U. S. 293, 299 (1943), the very language of the Act suggests that a federal court is prohibited from issuing declaratory relief in state tax cases.[21] Additionally, because there is little practical difference between injunctive and declaratory relief, we would be hard pressed to conclude that Congress intended to prohibit taxpayers from seeking one form of anticipatory relief against state tax officials in federal court, while permitting them to seek another, thereby defeating the principal purpose of the Tax Injunction Act: "to limit drastically federal district court jurisdiction to interfere with so important a local concern

---

[20] See *Great Lakes Dredge & Dock Co.* v. *Huffman,* 319 U. S. 293, 299 (1943).

[21] In enacting the Declaratory Judgment Act, Congress recognized the substantial effect declaratory relief would have on legal disputes. Thus, while Congress perceived declaratory judgments as a device to reduce federal-court abuses associated with injunctions, Congress also recognized that declaratory relief would "settle controversies," S. Rep. No. 1005, 73d Cong., 2d Sess., 2 (1934), and permit the federal courts "the power to exercise in some instances preventive relief." H. R. Rep. No. 1264, 73d Cong., 2d Sess., 2 (1934).

as the collection of taxes." *Rosewell* v. *LaSalle National Bank*, 450 U. S. 503, 522 (1981).[22] As JUSTICE BRENNAN

---

[22] To be sure, in enacting the Tax Injunction Act, Congress considered primarily injunctions against state officials because that form of anticipatory relief was the principal weapon used by businesses to delay or avoid paying state taxes. See, *e. g.*, S. Rep. No. 1035, 75th Cong., 1st Sess., 1–2 (1937); 81 Cong. Rec. 1416 (1937) (remarks of Sen. Bone). Moreover, it is arguable that Congress' failure to mention the Declaratory Judgment Act, enacted only three years earlier, indicates that Congress intended the Tax Injunction Act to prohibit only federal injunctive relief. Nevertheless, the legislative history of the Tax Injunction Act demonstrates that Congress worried not so much about the form of relief available in the federal courts, as about divesting the federal courts of jurisidiction to interfere with state tax administration.

Both the Senate and House Reports, as well as the congressional debates of the Act, expressly rely on the congressional purpose underlying the Johnson Act of 1934, 28 U. S. C. § 1342, which divests the district courts of jurisdiction of any suit to "enjoin, suspend, or restrain the operation" of any public utility commission order. See S. Rep. No. 1035, *supra*, at 2; H. R. Rep. No. 1503, 75th Cong., 1st Sess., 2 (1937); 81 Cong. Rec. 1415–1417 (1937) (remarks of Sen. Bone). The legislative history of the Johnson Act, in turn, makes clear that its purpose was to prevent public utilities from going to federal district court to challenge state administrative orders or avoid state administrative and judicial proceedings. See, *e. g.*, S. Rep. No. 125, 73d Cong., 1st Sess., 3 (1933) (in support of the Johnson bill, declaring that a utility "will be required, in all cases where a State has set up a public utility commission, to proceed before that commission if it has any complaint. It can appeal from this State board to the State courts and, if it is dissatisfied with the final judgment of the supreme court of the State, it can take an appeal to the Supreme Court of the United States"); *id.*, at 33 ("It is the jurisdiction which Congress has given to Federal courts to pass on matters of State regulation which holds up the laws of the States, prevents the officials of the States from doing their duty, and robs the people of the benefit which would accrue to them, if the commissions which they have set up by law in the various States were permitted to perform their duty"); H. R. Rep. No. 1194, 73d Cong., 2d Sess., 2 (1934) (in opposition to the Johnson bill, declaring that it "seeks to withdraw completely from the district courts of the United States all jurisdiction in suits relating to orders of State administrative boards or commissions affecting rates chargeable by public utilities"); 78 Cong. Rec. 1916 (1934) (remarks of Sen. Johnson); *id.*, at 1918 ("the object is to make [the utilities] subject to

stated in his opinion concurring in part and dissenting in part in *Perez* v. *Ledesma*, 401 U. S. 82, 128, n. 17 (1971):

> "If federal declaratory relief were available to test state tax assessments, state tax administration might be thrown into disarray, and taxpayers might escape the ordinary procedural requirements imposed by state law. During the pendency of the federal suit the collection of revenue under the challenged law might be obstructed, with consequent damage to the State's budget, and perhaps a shift to the State of the risk of taxpayer insolvency. Moreover, federal constitutional issues are likely to turn on questions of state tax law, which, like issues of state regulatory law, are more properly heard in the state courts."

See *Fair Assessment in Real Estate Assn., Inc.* v. *McNary*, 454 U. S. 100, 108–109, n. 6 (1981).[23]

---

the jurisdiction of the laws of our States; to give them their rights in every instance to the trial of the question of fact first before the public-utility commission, to give them every legal right they have, and if any right that is guaranteed by the Constitution is infringed upon at all, then, of course, the legal right of appeal ultimately from the highest tribunal in the State to the United States Supreme Court"); *id.*, at 8324 (remarks of Rep. Mapes) ("It is simply a question as to whether or not States are going to be allowed to perform their proper functions in the supervision and fixing of rates, without interference of Federal law. It is a question as to whether or not Congress is going to continue to permit the utilities in important cases to thwart the will of the States and the State authorities. . . . This bill will only deprive the lower Federal courts of the jurisdiction they now have over rate cases"); *id.*, at 8328 (remarks of Rep. Lewis) ("The Johnson bill absolutely abolishes the jurisdiction of the United States courts in rate cases"); *id.*, at 8338 (remarks of Rep. Tarver) ("The Johnson bill contains but one substantive proposition, and that is to divest the district courts of the United States of jurisdiction in public-utility rate cases"); *id.*, at 8419 (remarks of Rep. Hancock) ("the Johnson bill seeks to [save time and money] by divesting the Federal courts of all jurisdiction in public-utility cases except the right of appeal to the Supreme Court of the United States after the final decision of the State court of last resort").

[23] This Court has long recognized the dangers inherent in disrupting the administration of state tax systems. See, *e. g., Dows* v. *City of Chicago,*

Consequently, because Congress' intent in enacting the Tax Injunction Act was to prevent federal-court interference with the assessment and collection of state taxes, we hold that the Act prohibits declaratory as well as injunctive relief. Accordingly, the District Court in these cases was without jurisdiction to declare the California tax provision unconstitutional or to issue its injunction against state authorities unless the appellees had no "plain, speedy and efficient remedy" in the state courts.

Last Term, in *Rosewell* v. *LaSalle National Bank*, this Court had occasion to consider the meaning of the "plain, speedy and efficient" exception in the Tax Injunction Act. After reviewing previous decisions [24] and the legislative history of the Act,[25] the Court concluded that the "plain, speedy and efficient" exception requires the "state-court remedy [to meet] certain minimal *procedural* criteria." 450 U. S., at 512 (emphasis in original). In particular, a state-court remedy is "plain, speedy and efficient" only if it "provides the taxpayer with a 'full hearing and judicial determination' at which she may raise any and all constitutional objections to the tax." *Id.*, at 514 (quoting *LaSalle National Bank* v. *County of Cook*, 57 Ill. 2d 318, 324, 312 N. E. 2d 252, 255–256

---

11 Wall. 108, 110 (1871) ("It is upon taxation that the several States chiefly rely to obtain the means to carry on their respective governments, and it is of the utmost importance to all of them that the modes adopted to enforce the taxes levied should be interfered with as little as possible. Any delay in the proceedings of the officers, upon whom the duty is devolved of collecting the taxes, may derange the operations of government, and thereby cause serious detriment to the public").

[24] See *Tully* v. *Griffin, Inc.*, 429 U. S. 68, 74 (1976); *Hillsborough* v. *Cromwell*, 326 U. S. 620, 625 (1946); *Great Lakes Dredge & Dock Co.* v. *Huffman*, 319 U. S., at 300–301.

[25] See 81 Cong. Rec. 1416 (1937) (remarks of Sen. Bone); S. Rep. No. 1035, 75th Cong., 1st Sess., 2 (1937). The Court also relied on the legislative history of the Johnson Act of 1934, 28 U. S. C. § 1342 (prohibiting federal-court interference with orders issued by state administrative agencies to public utilities), on which the Tax Injunction Act was modeled.

(1974)).[26] Applying these considerations, the *Rosewell* Court held that an Illinois tax scheme, requiring the taxpayer to pay an allegedly unconstitutional tax[27] and seek a refund through state administrative and judicial procedures, was a "plain, speedy and efficient remedy" within the meaning of the Tax Injunction Act. In reaching this holding, the Court specifically relied on legislative Reports demonstrating congressional awareness that refunds were the exclusive remedy in many state tax systems.[28]

The holding in *Rosewell* reflects not only Congress' express command in the Tax Injunction Act, but also the historical reluctance of the federal courts to interfere with the operation of state tax systems if the taxpayer had available an adequate remedy in the state courts. As this Court stated in *Dows* v. *City of Chicago*, 11 Wall. 108, 110 (1871), long before enactment of the Tax Injunction Act:

> "No court of equity will . . . allow its injunction to issue to restrain [state officers collecting state taxes], except where it may be necessary to protect the rights of the citizen whose property is taxed, and he has no adequate remedy by the ordinary processes of the law. It must appear that the enforcement of the tax would lead to a multiplicity of suits, or produce irreparable injury, . . . before the aid of a court of equity can be invoked."[29]

---

[26] See also 450 U. S., at 515, and n. 19, 517 (making clear that some opportunity to raise constitutional objections is the most important consideration); S. Rep. No. 1035, *supra*, at 2 (under the Tax Injunction Act, a "full hearing and judicial determination of the controversy is assured. An appeal to the Supreme Court of the United States is available as in other cases").

[27] The plaintiff in *Rosewell* had claimed that requiring payment of the county property tax violated her equal protection and due process rights.

[28] See S. Rep. 1035, *supra*, at 1 (state "statutes generally provide that taxpayers may contest their taxes only in refund actions after payment under protest"); H. R. Rep. No. 1503, 75th Cong., 1st Sess., 2 (1937).

[29] See also *Boise Artesian Hot and Cold Water Co.* v. *Boise City*, 213 U. S. 276, 282 (1909) (holding that "the illegality or unconstitutionality of a

In order to accommodate these concerns and be faithful to the congressional intent "to limit drastically" federal-court interference with state tax systems, we must construe narrowly the "plain, speedy and efficient" exception to the Tax Injunction Act.

With these cases and principles in mind, we turn to the California provisions to determine whether there exists a "plain, speedy and efficient" state remedy for the appellees' claim.

B

There is no dispute that appellees in the present cases can seek a refund of the California unemployment tax through state administrative and judicial procedures. Once a taxpayer has sought from, and been denied a refund by, the appropriate state agency, see Cal. Un. Ins. Code Ann. §§ 1176–1185 (West 1972 and Supp. 1982),[30] he may file an action

state or municipal tax or imposition is not of itself a ground for equitable relief in the courts of the United States. In such a case the aggrieved party is left to his remedy at law, when that remedy is as complete, practicable and efficient as the remedy in equity"); *Singer Sewing Machine Co. v. Benedict*, 229 U. S. 481, 488 (1913) (holding that federal courts will not enjoin the collection of unconstitutional state taxes where the taxpayer "ha[s] a plain, adequate and complete remedy" at law); *Great Lakes Dredge & Dock Co. v. Huffman, supra*, at 299 (holding that the same "considerations which have led federal courts of equity to refuse to enjoin the collection of state taxes, save in exceptional cases, require a like restraint in the use of the declaratory judgment procedure"); *Fair Assessment in Real Estate Assn., Inc. v. McNary*, 454 U. S. 100, 103 (1981) (noting that the Tax Injunction Act, "and the decisions of this Court which preceded it, reflect the fundamental principle of comity between federal courts and state governments that is essential to 'Our Federalism,' particularly in the area of state taxation").

[30] Apparently, California taxpayers cannot raise their constitutional challenges in the administrative tax refund proceeding unless an appellate court already has sustained such a challenge. See Cal. Const., Art. III, § 3.5, which provides in part that

"[a]n administrative agency . . . has no power:

"(a) To declare a statute unenforceable, or refuse to enforce a statute, on

in Superior Court for a refund of the taxes paid, raising all arguments against the validity of the tax. Cal. Un. Ins. Code Ann. § 1241 (West Supp. 1982). If the taxpayer is unsuccessful at trial, he may appeal the decision to higher state courts and ultimately seek review in this Court. Nothing in this scheme prevents the taxpayer from "rais[ing] any and all constitutional objections to the tax" in the state courts. *Rosewell* v. *LaSalle National Bank*, 450 U. S., at 514. As the Court in *Rosewell* noted, the "Act contemplates nothing more." *Id.*, at 516, n. 19.[31] Moreover, assuming that the appellees' constitutional claims are meritorious, an issue on which we express no view, there is every reason to believe that once a state appellate court has declared the tax unconstitutional the appropriate state agencies will respect that declaration. See *Pacific Motor Transport Co.* v. *State Board of Equalization*, 28 Cal. App. 3d 230, 236, 104 Cal. Rptr. 558, 562 (1972) (noting that while the "relief afforded may not 'prevent or enjoin' or otherwise hamper present or future tax assessment or collection effort . . . [i]t will be presumed that

---

the basis of it being unconstitutional unless an appellate court has made a determination that such statute is unconstitutional;

"(b) To declare a statute unconstitutional."

[31] Significantly, the California administrative and judicial scheme for challenging a tax assessment is remarkably similar to the Illinois scheme that we upheld in *Rosewell* as "plain, speedy and efficient." See 450 U. S., at 508–509, and nn. 6, 7. In fact, the California tax scheme is more favorable to the taxpayer than the Illinois scheme in that it requires the State to pay interest on improperly collected taxes. See Cal. Un. Ins. Code Ann. § 1242 (West Supp. 1982).

This Court has not hesitated to declare a state refund provision inadequate to bar federal relief if the taxpayer's opportunity to raise his constitutional claims in the state proceedings is uncertain. In *Hillsborough* v. *Cromwell*, 326 U. S. 620 (1946), the taxpayer could not raise his constitutional challenge in the administrative proceedings, and appeal to the state courts was discretionary with those courts. Consequently, because "there [was] such uncertainty concerning the New Jersey remedy as to make it speculative," *id.*, at 625, the Court held that the taxpayer could seek declaratory relief in federal court.

the governmental agency will respect a judicial declaration concerning a regulation's validity"). Accordingly, it appears that *Rosewell* is directly applicable to the present cases, and that the District Court had no jurisdiction to hear the appellees' claims.

The appellees contend, however, that the California refund procedures do not constitute a "plain, speedy and efficient remedy" because their claims can be remedied only by injunctive relief, and that such relief is unavailable in California courts to restrain the collection of state taxes. See n. 10, *supra*. Injunctive relief is necessary, the appellees claim, because prior to state judicial review, the employer must meet certain recordkeeping, registration, and reporting requirements, see Cal. Un. Ins. Code Ann. §§ 1085, 1086, 1088, 1092 (West 1972 and Supp. 1982), and potentially is subject to administrative benefit eligibility hearings[32] in violation of the appellees' First Amendment rights. The appellees thus fear that their constitutional rights will be violated before they have an opportunity to challenge the constitutionality of the unemployment tax scheme in state court.

This argument is unpersuasive. First, nothing in the California scheme precludes the appellees from challenging the unemployment tax before a benefit eligibility hearing is held for one of their former employees. As soon as an employer makes its first payment to the state unemployment insurance fund, it may file for a refund and, after exhausting state administrative remedies, seek a judicial determination of the constitutionality of the tax.[33] If the employer ultimately pre-

---

[32] Under Cal. Un. Ins. Code Ann. § 1256 (West Supp. 1982), a former employee can collect unemployment benefits only if he has not been dismissed for "misconduct" or has not "left his most recent work voluntarily without good cause."

[33] Part of the appellees' argument for the necessity of injunctive relief rests on the premise that payments to the state fund are made only after a benefit eligibility hearing has been held. Under 26 U. S. C. §§ 3309(a)(2) and 3304(a)(6)(B), however, the States are required to give nonprofit organizations, including the appellees, the option either of making regular contributions to the state unemployment insurance fund or of reimbursing the

vails on his constitutional argument, the state taxing authorities can be expected to respect that court's holding in future administrative proceedings. See *Pacific Motor Transport Co. v. State Board of Equalization, supra,* at 236, 104 Cal. Rptr., at 562. Thus, before any entanglement from the benefit eligibility hearings occurs, the appellees should be able to challenge the constitutionality of the state unemployment insurance taxes.

Second, while an employer may be subject to some recordkeeping and reporting requirements, or even a benefit eligibility hearing, pending the resolution of its constitutional claims in state court, it will be subject to the same burdens even if it seeks relief from the federal courts. Thus, whatever harm the appellees may suffer pending resolution of their constitutional claims, that harm is not reduced by seeking relief in federal court. Stated differently, there are no apparent advantages to federal-court relief that make state-court remedies less than "plain, speedy and efficient." [34]

Finally, we must keep in mind that at the time that it passed the Tax Injunction Act, Congress was well aware that refund procedures were the sole remedy in many States for unlawfully collected taxes. See S. Rep. No. 1035, 75th Cong., 1st Sess., 1 (1937); H. R. Rep. No. 1503, 75th Cong., 1st Sess., 2 (1937). [35] Carving out a special exception for tax-

---

fund for payments actually made to the employers' former employees. The nonprofit organizations are not required to choose the reimbursement method, however, and can make regular payments to the fund in advance of any employee being discharged.

[34] Our conclusion that the state-court remedy is plain, speedy and efficient is reenforced by our observation that it took the appellees in these cases over two years to obtain injunctive relief in federal court.

[35] The dissent errs when it states, without authority, that the Tax Injunction Act is not applicable to these cases because of the "layers of review that must be exhausted in the California system." *Post,* at 422, n. 4. Certainly, nothing in the legislative history of the Act suggests that requiring a taxpayer to seek a refund first through administrative procedures makes the state remedy less than "plain, speedy and efficient." More-

payers raising First Amendment claims would undermine significantly Congress' primary purpose "to limit drastically federal district court jurisdiction to interfere with so important a local concern as the collection of taxes." *Rosewell* v. *LaSalle National Bank*, 450 U. S., at 522.[36] Because we do not believe that Congress intended federal injunctions and declaratory judgments to disrupt state tax administration when state refund procedures are available, we decline to find an exception in the Tax Injunction Act for the appellees' claims.[37] Accordingly, because the appellees could seek a refund of their state unemployment insurance taxes, and thereby obtain state judicial review of their constitutional claims, we hold that their remedy under state law was "plain, speedy and efficient" within the meaning of the Tax Injunction Act, and consequently, that the District Court had no jurisdiction to issue injunctive or declaratory relief.[38]

---

over, the legislative history of the Johnson Act, after which the Tax Injunction Act was modeled, see n. 22, *supra*, makes clear congressional intent that a state remedy is "plain, speedy and efficient" even though a utility must proceed first through administrative and then judicial proceedings in order to challenge the constitutionality of utility rates. See S. Rep. No. 125, 73d Cong., 1st Sess., 2–3 (1933).

[36] In addition, there seems to be no principled basis for limiting the appellees' argument to First Amendment claims. Any employer required to pay state taxes in a manner allegedly violating the Equal Protection Clause, for example, might argue that the absence of state injunctive relief permitted the infliction of an irreparable injury that could be remedied only by a federal injunction.

[37] We also reject the appellees' argument to the extent that it assumes that the state courts will not protect their constitutional rights. As we stated in another context: "[W]e are unwilling to assume that there now exists a general lack of appropriate sensitivity to constitutional rights in the trial and appellate courts of the several States. State courts, like federal courts, have a constitutional obligation to safeguard personal liberties and to uphold federal law." *Stone* v. *Powell*, 428 U. S. 465, 494, n. 35 (1976).

[38] The state defendants also argue that because the Federal Government is an indispensable party to this action, and could not be compelled to submit to state-court jurisdiction, the state courts could not afford the appel-

## C

Despite the absence of jurisdiction in the District Court, the federal defendants urge us to consider the merits of the appellees' First Amendment claims because of the "public interest in, and the Secretary's need for, a definitive interpretation of 26 U. S. C. § 3309(b)." Brief for United States 21. The Government bases this argument on our decision in *McLucas* v. *DeChamplain*, 421 U. S., at 32, in which we held that "whether the District Court did or did not have jurisdiction to act, this case is properly here under § 1252." See also *Weinberger* v. *Salfi*, 422 U. S. 749, 763, n. 8 (1975).

The Government's argument is unavailing, however, for in *McLucas* and *Salfi*, *some* federal trial court had jurisdiction,[39]

---

lees complete relief. Consequently, the state defendants reason, the Tax Injunction Act does not deprive the District Court of jurisdiction. See Brief for Appellants State of California et al. 35. The error in this argument is its premise; as *St. Martin Evangelical Lutheran Church* v. *South Dakota*, 451 U. S. 772 (1981), demonstrates, the Federal Government need not be a party in order for the appellees to litigate their statutory and constitutional claims.

Finally, none of the parties suggests that we avoid the jurisdictional bar of the Tax Injunction Act by restricting our review to the appellees' challenge to 26 U. S. C. § 3309(b), and disregarding their challenge to the corresponding state provisions, §§ 634.5(a), (b). Such a suggestion would be untenable since, after all, the state provisions were enacted in order to comply with federal statutory requirements, and consequently are identically worded to the federal provisions. Thus, a challenge to FUTA would be a direct effort to "enjoin, suspend or restrain" state tax officials from collecting unemployment taxes from the appellees. Alternatively, if the challenge to FUTA would not affect the actions of state officials, there would be serious doubts whether the appellees were injured by FUTA's provisions. Accordingly, we vacate not only the District Court's judgment with respect to the appellees' state claims, but also its judgment regarding the constitutionality of FUTA.

[39] In both of those cases, the question was whether a single district judge or a three-judge district court had jurisdiction. In the present cases, by contrast, the issue is whether the federal courts or the state courts have jurisdiction.

whereas in the present cases, no federal district court had jurisdiction. If this Court were nonetheless to reach the First Amendment issues presented in these appeals, the litigants would have sidestepped neatly Congress' intent and our long-standing policy "to limit drastically" federal interference in the administration of state taxes when a "plain, speedy and efficient" state remedy is available.[40] Accordingly, we do not reach the appellees' First Amendment claims.

The judgment of the District Court is vacated, and the cases are remanded for further proceedings consistent with this opinion.

*So ordered.*

JUSTICE STEVENS, with whom JUSTICE BLACKMUN joins, dissenting.

Appellee Grace Brethren Church filed suit against the United States Secretary of Labor and other defendants in the United States District Court for the Central District of California claiming that the Federal Unemployment Tax Act violates the First Amendment to the Federal Constitution. The District Court held the Act unconstitutional. Pursuant to a federal statute providing for expedited review in cases of this kind,[1] the defendants appealed directly to this Court, by-

---

[40] Similarly, the state defendants' reliance on *Williams* v. *Zbaraz*, 448 U. S. 358 (1980), is misplaced. In that case, the District Court had held unconstitutional a federal statute that the parties had not challenged. We held that because there was no case or controversy on that issue, the District Court had exceeded its jurisdiction for that issue. *Id.*, at 367. Nevertheless, because of the holding of unconstitutionality we concluded that we had jurisdiction under § 1252 to "review the 'whole case.'" *Id.*, at 368. That review, however, was restricted to those issues over which the District Court had had jurisdiction, and we vacated that portion of the judgment holding the federal statute unconstitutional. *Ibid.*

[1] Title 28 U. S. C. § 1252 provides:

"Any party may appeal to the Supreme Court from an interlocutory or final judgment, decree or order of any court of the United States . . . hold-

passing the Court of Appeals precisely as Congress intended. Recognizing the need for prompt review of a constitutional question affecting the nationwide operation of a federal statute, the Court holds that this special jurisdiction was properly invoked. It then reaches the curious conclusion that, because some of the defendants are California taxing authorities that administer this cooperative federal-state program in that State, Congress intended that only *state* courts could pass on the constitutional validity of this *federal* statute.[2] Neither the language nor the legislative history of the Tax Injunction Act requires such a strange result.

The Tax Injunction Act provides that federal district courts "shall not enjoin, suspend, or restrain" the activities of state taxing authorities. The preclusion of federal injunctive relief was a response to a specific problem that concerned Congress in 1937. In the States in which taxpayers were required to challenge a tax assessment in a refund suit, only taxpayers that could sue state taxing authorities in federal court could obtain injunctive relief. The privileged taxpayers were primarily the foreign corporations that could invoke federal diversity jurisdiction. These federal suits were objectionable not only because of this discrimination but also because state treasuries often were deprived of tax revenues while the federal suits were adjudicated and because the federal suits involved only state-law questions that were more appropriate for state-court resolution. See S. Rep. No. 1035, 75th Cong., 1st Sess., 1–2 (1937); 81 Cong. Rec. 1416–1417 (1937) (Sen. Bone); see also *Rosewell* v. *LaSalle*

---

ing an Act of Congress unconstitutional in any civil action, suit, or proceeding to which the United States or any of its agencies, or any officer or employee thereof, as such officer or employee, is a party."

[2] A further irony is that the Secretary of Labor, who is certainly the principal defendant even if not an indispensable party, could remove such an action if it were filed in state court. Indeed, with respect to one of the actions consolidated in the District Court, the Secretary did just that.

*National Bank*, 450 U. S. 503, 533 (STEVENS, J., dissenting).

A literal reading of the Tax Injunction Act manifestly does not preclude the declaratory judgment entered in this litigation. Nor do the concerns that gave rise to its enactment require such a bar. Appellees' challenge is based on the Federal Constitution and is directed at a federal-state program administered according to federal requirements. Only federal questions are involved.

In *Great Lakes Dredge & Dock Co.* v. *Huffman*, 319 U. S. 293, the Court recognized that equitable considerations can in some cases provide adequate justification for federal courts to withhold declaratory relief when the Tax Injunction Act precluded injunctive relief. In the intervening 40 years, this equitable doctrine has been sufficient to protect state tax laws from unnecessary federal interference. Today, however, the Court confronts a situation in which the challenge to a state tax does not implicate these concerns.[3] Ironically, the absence in these unusual cases of the traditional justification for a ban on declaratory relief seems to spur the Court to revise the Tax Injunction Act to preclude declaratory as well as injunctive relief. To accomplish this revision, the Court must ignore the plain meaning of the statute and the limited concerns that gave rise to its enactment. The Court instead relies upon the legislative history of the Johnson Act, ch. 283, 48 Stat. 775, see *ante*, at 409–410, n. 22, even though that statute was enacted before the Declaratory Judgment Act, ch. 512, 48 Stat. 955. Even if that suspect analysis could be overlooked, the fact remains that, after the Declaratory Judgment Act was on the books for three years, Congress did not see fit to bar declaratory relief when it expressly precluded injunctive relief in the Tax Injunction Act. The avoidance of

---

[3] Indeed, to the extent that equitable considerations are implicated they favor the procedure followed in these cases whereby expedited review in this Court is available.

a decision on the merits in this litigation hardly seems worth the Court's nimble exercise in lawmaking.[4]

The Court has both the power and the duty to decide the merits.  I therefore respectfully dissent.

---

[4] There is an independent reason why the Tax Injunction Act does not preclude federal declaratory relief in this litigation.  When one compares the layers of review that must be exhausted in the California system with the direct appeal to this Court provided by 28 U. S. C. § 1252, one surely cannot conclude that the state system provides the "plain, speedy and efficient" remedy that Congress intended for the resolution of the federal questions these cases present.