YAKIMA VALLEY CABLEVISION, INC., Petitioner,

v.

FEDERAL COMMUNICATIONS COMMISSION and the United States of America, Respondents,

Board of Supervisors of Fairfax County, Virginia, United Cable Television Corporation, City of Fairfax, Virginia, Continental Cablevision of Michigan, Inc., National Cable Television Association, Inc., City of Southfield, Michigan, City of Sunnyside, Washington, et al., Intervenors.

CONNECTICUT CABLE TELEVISION ASSOCIATION, INC., Petitioner,

v.

FEDERAL COMMUNICATIONS COMMISSION and the United States of America, Respondents,

National Cable Television Association, Inc., Media General Cable of Fairfax, Inc., State of Connecticut, et al., Board of Supervisors of Fairfax County, Virginia, Intervenors.

Nos. 85–1464, 85–1665.

United States Court of Appeals, District of Columbia Circuit.

Argued May 8, 1986.

Decided July 8, 1986.

---

Stuart F. Feldstein, with whom Charles S. Walsh, Arthur H. Harding and Howard S. Shapiro, Washington, D.C., were on brief, for petitioner, Yakima Valley Cablevision, Inc., in No. 85–1464.

Brent N. Rushforth, with whom John I. Davis and Richard D. Marks, Washington, D.C., were on brief, for petitioner, Connecticut Cable Television Ass'n, Inc., in No. 85–1665. Arnold P. Lutzker, Washington, D.C., also entered an appearance, for petitioner in No. 85–1665.

Gregory M. Christopher, Counsel, F.C.C., with whom Jack D. Smith, Gen. Counsel, Daniel M. Armstrong, Associate Gen. Counsel, F.C.C., Robert B. Nicholson and Marion L. Jetton, Attys., Dept. of Justice, Washington, D.C., were on brief, for respondents in Nos. 85–1464 and 85–1665. Margaret G. Halpern and John J. Powers, III, Attys., Dept. of Justice, Washington, D.C., also entered appearances, for respondents in Nos. 85–1464 and 85–1665.

Craig J. Gehring with whom John L. Longstreth was on the brief, Washington, D.C., for intervenors, City of Southfield, Mich., et al., in No. 85–1464.

Donald J. Mulvihill, Hugh P. Morrison, Jr., Rand McQuinn, Kathy M. Silberthau, Washington, D.C., David M. Davenport, David Stitt and Michael H. Long, Fairfax, Va., were on brief, for intervenors, Board of Supervisors of Fairfax County, Va., et al., in Nos. 85–1464 and 85–1665.

Richard K. Greenberg, Hartford, Conn., was on brief, for intervenor, State of Conn., in No. 85–1665.

Brenda L. Fox, Carol A. Melton, Gardner F. Gillespie, Wesley R. Heppler, James F. Ireland, III, Ian D. Volner and Mark L. Pelesh, Washington, D.C., were on joint brief, for intervenors, National Cable Television Ass'n, Inc., et al., in Nos. 85–1464 and 85–1665.

Robert H. Ruxin, Seattle, Wash., entered an appearance, for intervenor, City of Sunnyside, Wash., et al., in No. 85–1464.

Before EDWARDS and BORK, Circuit Judges, and KOZINSKI,* Circuit Judge, United States Court of Appeals for the Ninth Circuit.

Opinion for the Court filed by Circuit Judge HARRY T. EDWARDS.

HARRY T. EDWARDS, Circuit Judge:

Petitioners Yakima Valley Cablevision, Inc. ("Yakima") and the Connecticut Cable Television Association, Inc. ("CCTA") challenge orders of the Federal Communications Commission ("FCC" or "the Commission") dismissing requests for declaratory

* Sitting by designation pursuant to 28 U.S.C. § 291(a) (1982).

rulings regarding the legality of certain state and local taxes imposed on earnings by cable companies. In each instance, the petitioner seeks a declaration by the FCC that the challenged taxes were excessive "franchise fees" under a now-rescinded FCC regulation[1] and under section 622 of the Cable Communications Policy Act of 1984 ("the Cable Act").[2] In dismissing the requests for declaratory relief, the FCC declined to address the merits of the underlying franchise-fee disputes. Rather, the FCC ruled that petitioners' claims with respect to taxes assessed before the enactment of the Cable Act were somehow moot. This ruling had the effect of applying retroactively its new policy of refusing to resolve franchise-fee disputes. The Commission also ruled that all current claims concerning the legality of taxes under the franchise-fee provisions of the Cable Act should be resolved by the courts, not the agency.

The petitioners have challenged the legality of the FCC's decision to decline review of franchise-fee disputes arising under the Cable Act. However, we have no occasion here to reach this issue. The initial petitions for declaratory rulings involved solely the status of certain state and local taxes under the FCC franchise-fee regulation; the Cable Act issues were not raised until later in the proceeding. Furthermore, the Commission's policy of deferring franchise-fee issues to courts was enunciated in a separate rulemaking proceeding that is not the subject of this appeal. Indeed, the FCC has recently issued a second rulemaking order that more fully explains the agency's enforcement policy with respect to the franchise-fee provisions of the Cable Act. A challenge to this new policy is now pending before the court in a separate appeal brought by the ACLU;[3] therefore, it would be wholly inappropriate for us to preempt consideration of this is-

sue by the panel assigned to hear the *ACLU* case. Instead, we will permit the petitioners to intervene in that case for the purpose of challenging the Commission's policy of forbearance.

We further hold, however, that the FCC has unreasonably failed to explain its decision not to address—under its now-rescinded franchise-fee regulation—disputes over franchise fees imposed *before* the enactment of the Cable Act. The petitioners in this case filed valid petitions requesting relief under a lawful FCC regulation pursuant to procedures established by the Commission. Beginning in 1972, the Commission routinely and consistently had settled franchise disputes under its franchise-fee regulation. Yet, in the instant case, although millions of dollars of past tax liability are at stake, and despite the fact that the FCC regulation unquestionably governs the legality of the taxes imposed before the enactment of the Cable Act, the FCC inexplicably has refused to resolve the franchise-fee disputes and has offered no explanation for its decision to apply *retroactively* its policy of forbearance. Under *Motor Vehicle Manufacturers Association of United States, Inc. v. State Farm Mutual Automobile Insurance Co.*,[4] we have no choice but to remand this issue to the FCC.

## I. BACKGROUND

In 1972, before enactment of the Cable Act, the FCC adopted cable television regulations pursuant to its authority under the Communications Act of 1934.[5] Recognizing that the imposition of unduly high franchise fees on cable companies by states and municipalities could hamper the FCC policy of encouraging the growth of cable systems, the Commission promulgated a regulation limiting the imposition of such fees. The regulation provided:

> Franchise fees shall be no more than 3 percent of the franchisee's gross revenues per year from all cable services in

---

1. 47 C.F.R. § 76.31 (1984).

2. 47 U.S.C. § 542 (Supp.II 1984).

3. *American Civil Liberties Union v. FCC,* No. 85–1666 (D.C.Cir. filed May 3, 1985).

4. 463 U.S. 29, 103 S.Ct. 2856, 77 L.Ed.2d 443 (1983).

5. 47 U.S.C. §§ 151 *et seq.* (1982).

the community (including all forms of consideration, such as initial lump sum payments). If the franchise fee is in the range of 3 to 5 percent of such revenues, the fee shall be approved by the Commission if reasonable upon showings: (a) by the franchisee, that it will not interfere with the effectuation of federal regulatory goals in the field of cable television, and (b) by the franchising authority, that it is appropriate in light of the planned local regulatory program. With respect to a system community unit that was franchised or in operation prior to March 31, 1972, the provisions of this paragraph shall not be effective unit [sic] the end of the system's current franchise period, or until 15 years from the date of initial grant of the franchise, whichever occurs first.[6]

Between 1972 and 1984, the Commission resolved numerous franchise-fee disputes under the regulation;[7] these disputes arose in three different contexts. First, by Commission regulation, cable companies were required to apply for a certificate of compliance, and franchise fees were required to be reported in the application.[8] In reviewing these applications, the FCC would treat the franchise fee as "null and void" to the extent that it violated the relevant Commission regulation.[9] Thus,

the Commission examined the legality of franchise fees imposed on every cable company requesting a certificate of compliance.

Second, under the FCC regulation, either a cable company or a franchising authority could apply for a "waiver" of the franchise-fee limits. Most commonly, a franchising authority would request a waiver in order to impose a five percent fee rather than a three percent fee.[10]

Finally, if—as in the instant case—a cable company believed that the franchising authority had increased a franchise fee beyond permissible levels after the company already had obtained a certificate of compliance, the company could seek relief in the form of a declaratory ruling from the FCC.[11] This procedure was the only mechanism to challenge an increase in a franchise fee imposed after a cable company had obtained a certificate of compliance.

So far as we can tell, until the instant case, the FCC had not once declined to resolve any legitimate franchise-fee dispute brought before the Commission pursuant to any of the foregoing procedures.[12]

In 1984, Congress enacted the Cable Act, with the goal of "establish[ing] a national policy that clarifies the current system of local, state and Federal regulation of cable television."[13] Section 622 of the Cable Act

---

6. 47 C.F.R. § 76.31 (1984). The regulation as initially promulgated in 1972 differs somewhat from that which had evolved by 1984. *See* 47 C.F.R. § 76.31(b) (1976).

7. *See, e.g., City of Miami, Florida,* 56 RAD.REG.2d (P & F) 458 (1984); *Warner Cable Corp. of Pittsburgh,* 53 RAD.REG.2d (P & F) 991 (1983); *General Electric Cablevision Corp.,* 51 RAD.REG.2d (P & F) 603 (1982); *Teleprompter Cable Communications Corp.,* 39 RAD.REG.2d (P & F) 1206 (1977); *Sammons Communications, Inc.,* 61 F.C. C.2d 452 (1976); *University City Television Cable Co.,* 60 F.C.C.2d 498 (1976); *In re New York State Comm'n on Cable Television,* 59 F.C.C.2d 1344 (1976), *modified,* 62 F.C.C.2d 975 (1977); *Arlington Telecommunications Corp.,* 53 F.C. C.2d 757 (1975); *Coastal Cable TV Co.,* 47 F.C. C.2d 877 (1974).

8. 47 C.F.R. § 76.11 (1978).

9. *In re Amendment of Part 76 of the Commission's Rules and Regulations,* 59 F.C.C.2d 378, 379 (1976).

10. A waiver could be obtained either by filing a "Petition for Special Relief" under 47 C.F.R. § 76.7 (1984), or by using the more general waiver provision in 47 C.F.R. § 1.3 (1984).

11. *See* 47 C.F.R. § 1.2 (1984) (incorporating declaratory ruling provision of the Administrative Procedure Act, 5 U.S.C. § 554(e) (1982)).

12. Although access to state court as an alternative to any of these three procedures was theoretically possible, in reality, the doctrine of primary jurisdiction precluded judicial relief. *See City of Peoria v. General Elec. Cablevision Corp.,* 690 F.2d 116, 120–22 (7th Cir.1982) (holding that FCC has primary jurisdiction over disputes about the validity and application of the Commission's franchise-fee regulation).

13. H.R.REP. No. 934, 98th Cong., 2d Sess. 19 (1984), U.S.Code Cong. & Admin.News 1984, pp. 4655–4656.

imposes a five percent statutory limit on franchise fees paid by a cable company:

(b) For any twelve-month period, the franchise fees paid by a cable operator with respect to any cable system shall not exceed 5 percent of such cable operator's gross revenues derived in such period from the operation of the cable system. For purposes of this section, the 12-month period shall be the 12-month period applicable under the franchise for accounting purposes. Nothing in this subsection shall prohibit a franchising authority and a cable operator from agreeing that franchise fees which lawfully could be collected for any such 12-month period shall be paid on a prepaid or deferred basis; except that the sum of the fees paid during the term of the franchise may not exceed the amount, including the time value of money, which would have lawfully been collected if such fees had been paid per annum.[14]

Unlike the FCC regulation, which did not define "franchise fee," the Cable Act provides a detailed definition:

(g) For the purposes of this section—

. (1) the term "franchise fee" includes any tax, fee, or assessment of any kind imposed by a franchising authority or other governmental entity on a cable operator or cable subscriber, or both, solely because of their status as such;

(2) the term "franchise fee" does not include—

(A) any tax, fee, or assessment of general applicability (including any such tax, fee, or assessment imposed on both utilities and cable operators or their services but not including a tax, fee, or assessment which is unduly discriminatory against cable operators or cable subscribers);

(B) in the case of any franchise in effect on October 30, 1984, payments which are required by the franchise to be made by the cable operator during the term of such franchise for, or in support of the use of, public, educational, or governmental access facilities;

(C) in the case of any franchise granted after October 30, 1984, capital costs which are required by the franchise to be incurred by the cable operator for public, educational, or governmental access facilities;

(D) requirements or charges incidental to the awarding or enforcing of the franchise, including payments for bonds, security funds, letters of credit, insurance, indemnification, penalties, or liquidated damages; or

(E) any fee imposed under title 17.[15]

Finally, section 622 limits the regulatory authority of the FCC and other federal agencies:

Any Federal agency may not regulate the amount of the franchise fees paid by a cable operator, or regulate the use of funds derived from such fees, except as provided in this section.[16]

The instant case involves two petitions brought to the FCC before the enactment of the Cable Act. In January 1984, the cities of Sunnyside and Grandview, Washington sought a declaratory ruling from the Commission that the FCC franchise-fee regulation "does not apply to a business and occupation tax levied by" the two cities on cable television systems operating within their jurisdictions.[17] In July 1984, petitioner CCTA also sought a declaratory ruling from the FCC, requesting a ruling "that the gross earnings tax imposed on cable television companies pursuant to [a Connecticut statute] is a franchise fee which exceeds the limitations" provided by the FCC regulation.[18] The outcome of these franchise-fee disputes would determine both the legality of taxes already

---

**14.** 47 U.S.C. § 542(b) (Supp.II.1984).

**15.** *Id.* § 542(g).

**16.** *Id.* § 542(i).

**17.** Petition For Declaratory Ruling, *reprinted in* Joint Appendix ("J.A.") 27.

**18.** Petition For Declaratory Ruling, *reprinted in* J.A. 174.

imposed on the cable systems and the legality of the prospective application of the taxes.

On October 30, 1984, while these two petitions were pending, Congress enacted the Cable Act, and soon thereafter, on December 19, 1984, the Mass Media Bureau dismissed all pending petitions that concerned the FCC franchise-fee regulation— *e.g.,* petitions for special relief, petitions for waivers and petitions for declaratory rulings—including those of CCTA, Sunnyside and Grandview. The Bureau noted the recent enactment of the Cable Act, and reasoned that section 622 of that Act

> established a limitation on the amount any cable operator may be required to pay under the terms of a franchise. This clear delineation of the franchise fee limit supercedes [sic] Commission regulatory policy as enunciated in Section 76.31 of the Commission's Rules.... The above-described provisions of this new Act limit the Commission's jurisdiction and authority in this area and appear to remove any necessity for action on the petitions described above.[19]

All of the pending petitions were dismissed "as moot" without any distinction between requests for declaratory rulings and requests for waivers.[20] However, the Cable Act was not yet in operation, and the FCC regulation limiting fees to three percent remained in effect.

In January 1985, CCTA and Yakima (the cable system affected by the Grandview and Sunnyside petition) filed applications for review with the Commission. In their applications, Yakima and CCTA argued that the petitions were not moot because there remained a dispute over franchise fees imposed before the effective date of the Cable Act and that, in any event, the taxes at issue were also "franchise fees" within the definition provided by the Cable Act.

While these applications for review were pending, the FCC promulgated new rules to enforce the Cable Act. The Commission announced a new policy of leaving franchise disputes to the courts and stated that it was rescinding its old franchise-fee regulation because the Cable Act

> renders our rules invalid with respect to setting franchise fee limits. Section 622 of the Cable Act spells out quite clearly the terms of the franchise fee and how it is defined and administered. Therefore, there is no need for us to further define these matters. We believe that any disputes involving the franchise fee are best resolved through the courts. Accordingly, we are deleting § 76.31 of the rules, entitled "Franchise Standards."[21]

In the rulemaking order, the FCC also "decline[d] to return [pending franchise-fee petitions] to active status. The Commission no longer has regulatory interest in adjudicating petitions that have been rendered moot by the Cable Act."[22] Thus, the effect of the Commission's order was to *retroactively* apply its policy of leaving franchise-fee disputes to the courts.

Subsequently, on July 19, 1985, the FCC dismissed the Yakima and CCTA applications for review on the basis of the forbearance policy announced in *Implementation.* According to the Commission, "all franchise fee disputes should be resolved through the courts," because "Congress has set new guidelines under which cable system franchise fees are to be handled,

---

**19.** *In re City of Southfield, Michigan,* FCC Mimeo No. 1442, order at 3 (released Dec. 19, 1984), *reprinted in* J.A. 206.

**20.** *Id.* Most of the petitions were requests for waivers; *i.e.,* requests for permission to raise franchise fees from three percent to five percent. Because the Cable Act permitted franchise fees of up to five percent without waiver, these petitions may indeed have been moot to the extent that they sought permission to raise franchise fees prospectively.

**21.** *Implementation of the Provisions of the Cable Communications Policy Act of 1984,* 50 Fed.Reg. 18,637, 18,648 (1985), *petition for review pending sub nom. ACLU v. FCC,* No. 85–1666 (D.C. Cir. filed May 3, 1985) [hereinafter cited as *Implementation* ].

**22.** *Implementation,* 50 Fed.Reg. at 18,648 n. 55.

thus effectively removing the resolution of such matters outside the Commission's area of concern." [23]

These petitions for review followed.

## II. ANALYSIS

### A. *Cable Act Issues*

Yakima and CCTA urge this court to order the FCC to determine the current status of the taxes under the new franchise-fee provisions of the Cable Act. Although the Commission has announced a policy of leaving franchise-fee issues to the courts, the petitioners contend that this policy of forbearance is either illegal or, at the very least, arbitrary and capricious. Admittedly, the issues raised by Yakima and CCTA are not easy. Because of the operation of the Tax Injunction Act,[24] for example, it appears that the result of the Commission's policy of forbearance will be to leave the enforcement of the franchise-fee provisions of the Cable Act entirely to *state courts* despite the Cable Act's enunciated purpose of developing a *national* cable policy.[25]

These difficult questions, however, should not be decided in this proceeding. Instead, we conclude that they are best left to our pending review of the new Cable Act regulations in *ACLU v. FCC*.[26] The initial petitions for declaratory rulings involved only the status of taxes under the franchise-fee regulation; the Cable Act issues were not raised until the petitioners filed applications for review with the Commission in January 1985. Before the Commission even considered the petitioners' applications for review, the agency issued new rules to enforce the Cable Act and, in so doing, unambiguously announced the new policy of forbearance:

Section 622 of the Cable Act spells out quite clearly the terms of the franchise fee and how it is defined and administered. Therefore, there is no need for us to further define these matters. We believe that any disputes involving the franchise fee are best resolved through the courts.[27]

In other words, the forbearance policy was not promulgated in the instant case; rather, the new policy was developed in a separate rulemaking proceeding and was then relied upon in this case as one of the justifications for the dismissal of petitioners' requests for relief. Since the full sweep of the FCC's rationale is better understood in a careful review of the entire Cable Act rulemaking, we will decline to prejudge those issues in this appeal.

■ Accordingly, we conclude that the appropriate proceeding for review of the FCC's forbearance policy is in connection with the *ACLU* appeal now pending in this court.[28] However, because petitioners have been directly affected by an application of the forbearance policy, and have

---

**23.** *In re Yakima Valley Cablevision*, FCC 85–372, memorandum opinion and order at 3, *reprinted in* J.A. 299.

**24.** 28 U.S.C. § 1341 (1982). Franchise-fee disputes involve challenges to state and local taxes. The Tax Injunction Act prevents federal district courts from "enjoin[ing], suspend[ing] or restrain[ing] the assessment, levy or collection of any tax under State law where a plain, speedy and efficient remedy may be had in the courts of such State." *Id.* The Tax Injunction Act prohibits even declaratory relief. *See California v. Grace Brethren Church*, 457 U.S. 393, 102 S.Ct. 2498, 73 L.Ed.2d 93 (1982).

**25.** *See* 47 U.S.C. § 521 (Supp. II 1984) (listing establishment of a national cable policy as a purpose of the Cable Act); H.R.REP. No. 934, 98th Cong., 2d Sess. 20 (1984) U.S.Code Cong. & Admin.News 1984, p. 4657 (The Cable Act is designed to establish "a national framework and Federal standards for cable franchising" and thus to provide "the cable industry with the stability and certainty that are essential to its growth and development."); *id.* at 40 ("[T]here has never been a national policy to guide the development of cable television. Title VI establishes such a national policy.").

**26.** No. 85–1666 (D.C.Cir. filed May 3, 1985). *ACLU v. FCC* was held in abeyance pending the Commission's disposition of several petitions for reconsideration.

**27.** *Implementation*, 50 Fed.Reg. at 18,648. Moreover, the FCC specifically "decline[d] to return [pending franchise-fee petitions] to active status." *Id.* at 18,648 n. 55.

**28.** *ACLU v. FCC*, No. 85–1666 (D.C.Cir. filed May 3, 1985).

raised their objections in a timely fashion, we will permit them to intervene in *ACLU v. FCC* for the express purpose of raising issues relating to the enforcement of the Cable Act's franchise-fee provisions.

### B. *The Franchise Fee Regulation*

Although we leave the Cable Act issues for later resolution in *ACLU v. FCC*, the lawfulness of the Commission's decision not to resolve the status of taxes imposed on the cable companies *before* the enactment of the Cable Act is appropriately before us at this time. The petitioners in this case filed valid petitions requesting relief under a lawful FCC regulation, and pursuant to a procedure established by the Commission. For over ten years, the FCC had routinely and consistently resolved franchise-fee disputes. Indeed, apart from the instant case, we cannot find a single instance in which the Commission refused to resolve a franchise-fee dispute.

The only possible explanation for the agency's refusal to resolve the petitioners' franchise-fee disputes is that the Commission *retroactively* changed its longstanding policy of resolving disputes under its franchise-fee regulation; no other credible explanation has been offered. The problem with this is that, as even agency counsel concedes, there is *absolutely no basis* in the administrative record for the FCC's retroactive change in its enforcement policy. Therefore, we are constrained to hold, under the principles announced in *Motor Vehicle Manufacturers Association of United States, Inc. v. State Farm Mutual Automobile Insurance Co.*,[29] that the Commission's action was arbitrary and capricious.

In *State Farm*, a unanimous Supreme Court ruled that an agency decision to rescind or modify a regulation is subject to review under the "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law" standard.[30] As part and parcel of this standard, "an agency changing its course by rescinding a rule is obligated to supply a reasoned analysis for the change." [31] As the *State Farm* Court explained:

> Normally, an agency rule would be arbitrary and capricious if the agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise.[32]

Because the FCC announced its change in enforcement practice in the order promulgating new rules to enforce the Cable Act, the principles of *State Farm* apply to the Commission's decision to leave franchise-fee issues to the courts. We need not decide whether the Commission's *prospective* change in its enforcement of the franchise-fee regulations would satisfy the requirements of *State Farm*. That issue is simply not before us; for the purposes of the instant case, we will assume without deciding that such a change in policy would be lawful. Rather, the question in this case is whether the Commission adequately explained its decision to change its enforcement policy *retroactively*.

 Without doubt, the decision whether to make a new policy prospective or retroactive is "an important aspect of the problem" [33] that must be considered by an agency changing a longstanding policy. Indeed, courts have long hesitated to permit retroactive rulemaking and have noted its troubling nature. When parties rely on

---

**29.** 463 U.S. 29, 103 S.Ct. 2856, 77 L.Ed.2d 443 (1983).

**30.** 5 U.S.C. § 706(2)(A) (1982); *State Farm*, 463 U.S. at 41, 103 S.Ct. at 2865; *see also ILGWU v. Donovan*, 722 F.2d 795, 812–13 (D.C.Cir.1983), *cert. denied,* —— U.S. ——, 105 S.Ct. 93, 83 L.Ed.2d 39 (1984).

**31.** *State Farm*, 463 U.S. at 42, 103 S.Ct. at 2866.

**32.** *Id.* at 43, 103 S.Ct. at 2866.

**33.** *Id.*

an admittedly lawful regulation and plan their activities accordingly, retroactive modification or rescission of the regulation can cause great mischief. Of course, an agency must balance this mischief against the salutary effects, if any, of retroactivity. Reviewing courts, in turn, must critically examine retroactive rulemaking to ensure that the agency has appropriately balanced the competing considerations.[34] In the context of administrative adjudication, this circuit has developed factors to guide our determination of whether an agency may give retroactive effect to a new policy developed in adjudication.[35]

Obviously, in many instances, a retroactive change in policy is perfectly appropriate; however, the law requires that an agency explain why it has decided to take this rather extraordinary step. The agency must explain how it determined that the balancing of the harms and benefits favors giving a change in policy retroactive application. Only if an agency explains its rationale for retroactively changing its prior practice can a reviewing court determine whether that decision is a product of rational analysis. The Commission's failure to explain why it retroactively applied its new policy of leaving franchise-fee

issues to the courts differs not at all from a failure to consider obvious alternatives to an agency's course of action. The FCC failed to consider an obvious and less drastic alternative to a retroactive change in enforcement policy—the prospective application of this new policy—and its failure to consider such an important alternative was arbitrary and capricious under the settled law of this circuit.[36] Put simply, the FCC arguably may change an enforcement policy retroactively, but its decision to do so must be justified and is subject to judicial review.

Although counsel for the Commission conceded at oral argument that there is absolutely no basis in the record for the agency's decision to change its enforcement policy retroactively, the FCC contends that we should affirm the Commission's exercise of its "sound discretion" [37] not to issue a declaratory ruling. We disagree. In the instant case, the Commission flatly refused to process *all* pending cases under an existing rule pursuant to long-standing procedures developed to resolve franchise-fee disputes. No intelligible explanation was offered for its decision. This unexplained retroactive shift in agency pol-

**34.** In *Greene v. United States,* 376 U.S. 149, 84 S.Ct. 615, 11 L.Ed.2d 576 (1964), for example, the Supreme Court was faced with the issue of whether a claim for monetary restitution should be processed under a 1955 Department of Defense regulation or a 1960 regulation. The Court concluded that the petitioner's rights "matured and were asserted" under the 1955 regulation, *id.* at 160, 84 S.Ct. at 621, and refused to allow the government to give the 1960 regulation retroactive application. *Id.*

**35.** *See Local 900, International Union of Elec., Radio & Mach. Workers v. NLRB,* 727 F.2d 1184, 1194–95 (D.C.Cir.1984); *Retail, Wholesale & Dep't Store Union v. NLRB,* 466 F.2d 380, 390 (D.C.Cir.1972).

**36.** The failure of an agency to consider obvious alternatives has led uniformly to reversal. *See, e.g., National Black Media Coalition v. FCC,* 775 F.2d 342, 357 (D.C.Cir.1985) (FCC's failure to consider options other than full seven-year license renewal was flaw in agency decisionmaking); *Public Citizen v. Steed,* 733 F.2d 93, 103–05 (D.C.Cir.1984) (NHTSA suspension of tire-grading regulation was arbitrary and capricious be-

cause agency failed to pursue available alternatives); *ILGWU v. Donovan,* 722 F.2d at 815–18 (failure to consider less far-reaching choices than complete rescission of homework restrictions was arbitrary and capricious); *Office of Communication of United Church of Christ v. FCC,* 707 F.2d 1413, 1440 (D.C.Cir.1983) (FCC's failure to give sufficient consideration to modification, rather than elimination of programming log requirements was arbitrary and capricious); *Action on Smoking & Health v. CAB,* 699 F.2d 1209 (D.C.Cir.), *opinion supplemented by* 713 F.2d 795 (D.C.Cir.1983) (CAB failure to consider alternatives to rescission of certain restrictions on smoking in airplanes mandates remand).

**37.** The Administrative Procedure Act specifically provides for declaratory rulings, but leaves the decision to issue such a ruling to the "sound discretion" of the agency:

> The agency, with like effect as in the case of other orders, and in its sound discretion, may issue a declaratory order to terminate a controversy or remove uncertainty.

5 U.S.C. § 554(e) (1982).

icy surely is not insulated from review on a claim of an exercise of "sound discretion." In short, the Commission cannot avoid its obligation to justify retroactive rulemaking by relying on counsel's *post hoc* attempt to recast the nature of the agency's action.

■ Furthermore, although the Commission has broad power to refuse to grant declaratory relief, its decision to do so is subject to judicial review.[38] Therefore, even if the Commission had exercised its discretion to deny declaratory relief, the complete absence of an explanation for that denial would preclude affirmance.

■ Similarly, we reject the contentions of the intervening franchising authorities. They argue that the Cable Act applies retroactively, and, therefore, that the Act mandates the retroactive rescission of the agency's regulation. Under this view, the substantive provisions of the franchise-fee regulation, and not merely the remedy provided by the FCC, would be retroactively ineffective. This argument has absolutely no merit. First, nothing in the Cable Act even remotely implies that the rescission of the regulation must be retroactive. Instead, the Cable Act merely mandates that "[a]ny Federal agency may not regulate the amount of the franchise fee paid by a cable operator,"[39] and explicitly provides a *prospective* effective date for the Cable Act provisions:

Except where otherwise expressly provided, the provisions of this Act and the amendments made thereby shall take effect 60 days after the date of enactment of this Act.[40]

Second, the legislative history of the Cable Act makes clear that Congress intended to make only one narrow exception to the prospective effect of the Cable Act's franchise-fee provisions. Under the old FCC regulation, franchising authorities required Commission permission to increase a franchise fee from three percent to five percent. The Cable Act, however, permits a five percent fee without FCC approval. The Conference Report for the Cable Act makes it clear that any payments of franchise fees already made by a cable system up to five percent would be lawful without FCC permission if the franchise agreement established such a fee:

Any franchise in effect on the effect [sic] date of [the Cable Act] that provides for a franchise fee in an amount up to or in excess of the five percent limitation in section 622(b) (with or without the need for action by any Federal agency) shall be deemed to have lawfully required such fee, up to but not in excess of five percent, as of such effective date, except that where a franchise explicity [sic] establishes a later date or any condition for the imposition of such fee, such later date or condition shall apply.[41]

The Report states, however, that cable companies need not make retroactive payments.

Nothing in section 622 shall authorize any payment toward any such fee (of the type described in the paragraph above) for any period *prior to the effective date of this title unless such payment has been made prior to such date to a franchising authority.*[42]

**38.** *See Intercity Transp. Co. v. United States,* 737 F.2d 103, 107–08 (D.C.Cir.1984); *Yale Broadcasting Co. v. FCC,* 478 F.2d 594, 602 (D.C.Cir.), *cert. denied,* 414 U.S. 914, 94 S.Ct. 211, 38 L.Ed.2d 152 (1973). Moreover, in all of the cases in which an agency refusal to issue a declaratory order has been affirmed, the agency explicitly relied on its discretion to so refuse and discussed the justifications for its exercise of this discretion. *See Intercity Transp. Co.,* 737 F.2d at 108–09; *Climax Molybdenum Co. v. Secretary of Labor,* 703 F.2d 447, 452 (10th Cir. 1983); *Yale Broadcasting Co.,* 478 F.2d at 602.

**39.** 47 U.S.C. § 542(i) (Supp. II 1984).

**40.** *Id.* § 521 note.

**41.** 130 Cong.Rec. S14,285 (daily ed. Oct. 11, 1984).

**42.** *Id.* (emphasis added). Representative Dingell, however, suggested that even if payments had *not* been made, the franchising authority would be entitled to payment. *See* 130 Cong. Rec. H12,241 (daily ed. Oct. 11, 1984). Because the question is irrelevant to the instant case, we do not reach this issue.

Thus, Congress intended only a narrow exception to the prospective effect of the Cable Act's franchise-fee provision. All *other* aspects of that provision must have prospective effect, as specifically required by the Act.

■ Finally, because the Cable Act unambiguously declares a prospective effective date, the case law on retroactivity discussed at length by the parties is simply not relevant. However, even if the Cable Act is somehow viewed as ambiguous on the question of retroactivity, the prevailing case law creates a presumption of prospective effect. In its most recent treatment of retroactivity, in *Bennett v. New Jersey*,[43] the Supreme Court carefully noted that statutes affecting substantive rights are presumed to have prospective effect. There the Court refused to apply retroactively amendments to Title I of the Elementary and Secondary Education Act. In reaching this result in *Bennett*, the Court carefully limited the applicability of *Bradley v. Richmond School Board*,[44] which contains broad language about a presumption of retroactivity. The Court explained:

> [T]he presumption announced in *Bradley* does not apply here. *Bradley* held that a statutory provision for attorneys fees applied retroactively to a fee request that was pending when that statute was enacted. This holding rested on the general principle that a court must apply the law in effect at the time of the decision ... which *Bradley* concluded holds true even if the intervening law does not expressly state that it applies to pending cases.... *Bradley*, however, expressly acknowledged limits to this principle. "The Court has refused to apply an intervening change to a pending action where it has concluded that to do so would

infringe upon or deprive a person of a right that had matured or become unconditional." ... This limitation comports with another venerable rule of statutory interpretation, *i.e.*, that statutes affecting substantive rights and liabilities are presumed to have prospective effect.[45]

Similarly, this circuit views statutes that change substantive *rights* as differing from those—as in *Bradley*—that merely change substantive *remedies*.[46] Without doubt, the Cable Act affects the substantive rights of cable companies to be free of certain local taxes. We conclude, therefore, that a presumption of prospective effect applies to the Cable Act franchise-fee provisions.

■ In sum, by the FCC counsel's own admission, we are left without explanation for the Commission's refusal to resolve the petitioners' franchise-fee disputes. We therefore hold that the FCC decision to change retroactively its longstanding policy of resolving disputes over the franchise-fee regulation was arbitrary and capricious.

## III. CONCLUSION

Because this court will review the Commission's Cable Act regulations in *ACLU v. FCC*, we do not address the FCC's policy of forbearance in this action. Instead, the petitioners shall be given the right to intervene in *ACLU v. FCC* for the purpose of challenging the Commission's policy of leaving franchise-fee disputes to the courts. However, because the Commission has not justified its refusal to resolve franchise-fee disputes arising before the enactment of the Cable Act, we remand that issue to the FCC for further consideration.

*So ordered.*

**43.** —— U.S. ——, 105 S.Ct. 1555, 84 L.Ed.2d 572 (1985).

**44.** 416 U.S. 696, 94 S.Ct. 2006, 40 L.Ed.2d 476 (1974).

**45.** 105 S.Ct. at 1560 (quoting *Bradley*, 416 U.S. at 720, 94 S.Ct. at 2020).

**46.** *See Eikenberry v. Callahan*, 653 F.2d 632, 635 n. 14 (D.C.Cir.1981) (calling the right/remedy distinction a relevant one for determining retroactivity); *Hastings v. Earth Satellite Corp.*, 628 F.2d 85, 93–94 (D.C.Cir.) ("courts are much more inclined to apply retroactively amendments directed at the *remedy* rather than changes in *substantive rights*") (emphasis in original), *cert. denied*, 449 U.S. 905, 101 S.Ct. 281, 66 L.Ed.2d 137 (1980).

*POSTSCRIPT*

We note that, in a post-hearing submission from the FCC, the agency purports to have considered the issue of retroactivity which is the subject of our remand. We need not determine the adequacy of this submission at this juncture. If what the agency has done in its reconsideration order satisfies the terms of our remand, we assume that the entire reconsideration order, including the issue of retroactivity, will be subject to judicial scrutiny in *ACLU.*