**MUDGE ROSE GUTHRIE ALEXANDER & FERDON, Appellant**

v.

**U.S. INTERNATIONAL TRADE COMMISSION, et al.**

No. 87–5312.

United States Court of Appeals, District of Columbia Circuit.

Argued April 8, 1988.

Decided May 20, 1988.

As Amended May 31, 1988.

---

N. David Palmeter, Washington, D.C., for appellant.

Andrea C. Casson, Atty., Intern. Trade Com'n, with whom James A. Toupin, Asst. Gen. Counsel, Intern. Trade Com'n, Washington, D.C., was on the brief for appellees.

Before WALD, Chief Judge, ROBINSON and STARR, Circuit Judges.

Opinion for the Court filed by Chief Judge WALD.

WALD, Chief Judge:

Appellant Mudge Rose Guthrie Alexander & Ferdon (Mudge Rose) brought this Freedom of Information Act (FOIA) case against the U.S. International Trade Commission (ITC), seeking disclosure of certain aggregate data compiled in a countervailing duty, antidumping investigation. The district court granted the Commission's cross-motion for summary judgment, holding that (1) § 777 of the Tariff Act of 1930 (Tariff Act), 19 U.S.C. § 1677f, qualifies as a withholding statute that triggers Exemption 3 of the FOIA; and (2) the aggregate data sought by Mudge Rose was confidential within the meaning of § 777 because it could be associated with or used to identify the operations of particular firms. In the district judge's view, it was reasonable for the Commission to base its confidentiality determinations on a set of internal guidelines, which assumed that in industries dominated by one or two firms, aggregate data necessarily reveals identifying characteristics about the operations of the individual firms. We agree with the district court that § 777 of the Tariff Act qualifies as an Exemption 3 statute. Unlike the district court, however, we find that the Commission has failed to provide an adequate rationale for the nondisclosure guidelines it applied in this case. We therefore remand to the district court to seek a comprehensible explanation from the Commission of why it is generally true that if one knows the aggregate data on sales, revenues, etc. for an industry in which one firm is responsible for 75% or two firms for 90% of the total production, it is invariably possible to discern the proportionate shares of all the firms as to these data.

## I. BACKGROUND

Under title VII of the Tariff Act, the ITC conducts antidumping and countervailing duty investigations to determine whether a domestic industry suffers or is threatened with material injury by reason of unfair imports. See 19 U.S.C. §§ 1671, 1673. On January 21, 1986, the ITC began an antidumping and countervailing duty investigation of certain top-of-the-stove stainless steel cookware imports from Korea and Taiwan. The Commission sent questionnaires requesting commercial and financial information as to production, sales, and revenues to nine domestic producers and 40 importers of top-of-the-stove cookware. When the questionnaire responses were returned, an ITC investigator compiled and analyzed the data. The compiled data was then used in preparing the Commission's investigation report. All nine domestic producers and 22 of the importers responded to the questionnaires. The responses indicated that six of the domestic firms produced cookware for retail sales and five of the domestic companies produced cookware for door-to-door sales or for export.

*See* Appellant's Appendix To Its Principal Brief (A.) at 48–50.

On February 28, 1986, the Commission found a reasonable indication that the domestic top-of-the-stove cookware industry was threatened with material injury by reason of subsidized or unfairly priced imports from Korea and Taiwan. *See* Appellant's Supplemental Appendix (S.A.) at 7. In preparing the public version of the Commission's report, the ITC investigators determined that the aggregate data in dispute could be associated with or used to disclose the operations of particular firms and thus came within the protection of § 777. Accordingly, the Commission deleted the aggregate data from the appendix of the published report. *See* A. at 50, 56. In deciding whether to withhold the aggregate information, the Commission relied upon a set of internal guidelines which, although nonbinding, were approved by the Commission on June 3, 1976. *See id.* at 38–39; Commission's Brief at 7. The data withheld from the public report included aggregate industry information regarding domestic shipments, production, capacity, capacity utilization, exports, inventory, employment, income, loss, net sales, operating income, and the ratio of operating income to net sales. *See* A. at 26.

Appellant Mudge Rose is the representative of the Korean producers and exporters that were investigated by the ITC. On March 19, 1986, following issuance of the public report, Mudge Rose made a FOIA request for the aggregate data withheld by the ITC. The Secretary of the ITC denied appellant's request on the ground that the requested data fell within Exemptions 3 and 4 of the FOIA. *See id.* at 15. Because of the small number of firms in the domestic top-of-the-stove cookware industry, the Secretary contended, release of the requested statistics "would have the effect of revealing the operations of individual firms in the industry." *Id.* After the denial of its administrative appeal on May 13, 1986, Mudge Rose brought an action in district court seeking summary judgment. The Commission filed a cross-motion for summary judgment.

The district court concluded first that § 777 of the Tariff Act is an Exemption 3 withholding statute because it specifically exempts from disclosure "particular types of matters"—to wit, matters designated as "proprietary" [1] that could be associated with or used to identify individual firms. The district court then upheld the Commission's determination that the data requested by Mudge Rose, although aggregated from the data of three or more firms, came within § 777's definition of confidential business information. In the district court's view, the nondisclosure guidelines on which the Commission relied were "consistent with [§ 777's] goal of protecting domestic firms which might suffer competitive injury from the disclosure of information submitted by them in confidence." *See id.* at 31. Accordingly, the district court granted the Commission's cross-motion for summary judgment.[2] This appeal followed.

## II. DISCUSSION

### A.

Exemption 3 of the FOIA excepts from mandatory disclosure matters that are:

---

**1.** At the time of appellant's FOIA request, § 777 referred to "confidential" rather than "proprietary" information. Prior to the district court's decision to uphold the Commission, Congress amended § 777 so that the term "proprietary" replaced the term "confidential" throughout the provision. *See* Tax Reform Act of 1986, Pub.L. No. 99–514, § 1886(a)(13), 100 Stat. 2922. The parties agree that in changing the operative language of § 777 Congress did not intend to change the substance of the statute's disclosure provisions. *See* Appellant's Brief at 19; Commission's Brief at 19 n. 12. Rather, Congress substituted "proprietary" for "confidential" only to "clarify that the reference always is to sensitive company commercial and financial data

rather than national security information at the 'confidential' level." *Problems of Access By Small Businesses To Trade Remedies: Hearing On S. 1043 Before the Subcomm. on International Trade of the Comm. on Finance,* 98th Cong., 2d Sess. 202 (1984). Because the substitution of terms was a purely technical amendment, we use the words "proprietary" and "confidential" interchangeably in this opinion.

**2.** Because the district court agreed with the Commission that the requested data fell within Exemption 3, it refrained from addressing the applicability of Exemption 4. *See* A. at 31.

*specifically exempted from disclosure by statute ... provided that such statute* (A) requires that the matters be withheld from the public in such a manner as to leave no discretion on the issue, or (B) establishes particular criteria for withholding *or refers to particular types of matters to be withheld.*

5 U.S.C. § 552(b)(3) (emphasis added). The first issue at hand is whether the district court, in its exercise of *de novo* review, properly determined that § 777 of the Tariff Act qualifies under subsection (B) as an Exemption 3 withholding statute. *See Association of Retired Ry. Wkrs., Inc. v. United States Ry. Retirement Bd.,* 830 F.2d 331, 335 (D.C.Cir.1987). Section 777 (as amended by the Tax Reform Act of 1986) provides in relevant part:

(a) Information generally made available.

(4) ... [T]he Commission may disclose—

(A) *any proprietary information* received in the course of a proceeding *if it is disclosed in a form which cannot be associated with, or otherwise be used to identify, operations of a particular person,* ...

(b) Proprietary information.

(1) ... Except as provided in subsection (a)(4)(A) ... *information submitted ... which is designated as proprietary by the [submitter] shall not be disclosed to any person* ...

19 U.S.C. § 1677f (emphasis added). The district court found that § 777 satisfies the second prong of Exemption 3(B) because § 777 explicitly exempts from disclosure "particular types of matters"—namely, matters designated as "proprietary" that can be associated with or used to identify the operations of particular firms in the industry. *See* A. at 28–29; *see also Irons & Sears v. Dann,* 606 F.2d 1215 (D.C.Cir. 1979).

Mudge Rose raises two objections to the district court's holding that § 777 is an Exemption 3 statute. In our view, neither objection has merit. Appellant argues first that "there is no indication of a Congressional purpose to erect [§ 777 as] a new Exemption 3 barrier to disclosure." Appel-

lant's Reply Brief at 5. This argument is beside the point. Exemption 3 unambiguously excepts from disclosure any matters that are "specifically exempted from disclosure by statute," provided only that the withholding statute explicitly "refers to particular types of matters to be withheld." 5 U.S.C. § 552(b)(3)(B). Any withholding statute that satisfies these conditions is sufficient to trigger Exemption 3. Appellant's suggestion that there must be an additional showing that Congress, in enacting a particular withholding statute, intended that statute to be "a new Exemption 3 barrier," is inconsistent with the express terms and the plain meaning of Exemption 3.

 Mudge Rose's second objection is similarly baseless. According to appellant, § 777 is so broad that it allows the ITC to withhold any and all business information and, therefore, fails to specify "particular types of matters to be withheld," as required by Exemption 3. In Mudge Rose's view, the situation in the present case is similar to that in *CNA Financial Corp. v. Donovan,* 830 F.2d 1132 (D.C.Cir.1987), *cert. denied,* —— U.S. ——, 108 S.Ct. 1270, 99 L.Ed.2d 481 (1988). In *CNA,* this court held that the Trade Secrets Act is not a general withholding statute under Exemption 3, reasoning:

In sum, the Trade Secrets Act appears to cover practically *any* commercial or financial data collected by *any* federal employee from *any* source in performance of the duties of his or her employment....

*Given this encyclopedic character, and absent any limitation as to the agencies covered or the sources of data involved,* we unhesitantly conclude that the laundry list of information the Act sets out does not specify "particular types of matters" for purposes of satisfying Subsection (B) of Exemption 3.

*Id.* at 1140–41 (emphasis added) (footnotes omitted). The withholding provision at issue here is completely different in character. Section 777 of the Tariff Act applies only to the ITC and the International Trade Administration (ITA), not to *any* agency.

Moreover, § 777 pertains solely to title VII of the Tariff Act and does not address the release of confidential information under any of the various other statutes administered by the ITC. Finally § 777 protects only title VII information that is "designated as proprietary" and which could "be associated with, or otherwise be used to identify, operations of a particular person." 19 U.S.C. § 1677f. Thus, the material covered under § 777 does not in any way qualify as a "laundry list," and the disclosure rationale of *CNA* does not apply. Because § 777 clearly satisfies the conditions of subsection (B) we conclude, along with the district court, that it is properly classified as an Exemption 3 withholding statute.

### B.

We next consider whether the aggregate data requested by Mudge Rose falls within the nondisclosure mandate of § 777. The ITC officials who prepared the public version of the investigation report determined that the data sought by Mudge Rose, although aggregated from three or more firms, could be associated with or used to identify the operations of individual firms and thus fell within the strictures of § 777. The Commission investigators based their determinations on the following two guidelines:

3. In the case of three firms, one of which produces 75 percent of the domestic production, all business data will be deleted.

4. In the case of two firms producing 90 percent of the domestic production, all business data will be deleted.

A. at 44. Underlying both of these guidelines is the Commission's unexplained assumption that in industries dominated by one or two firms, aggregate data *"necessarily* reveal[s] confidential business information concerning the major producer or producers." Commission's Brief at 32 (emphasis added). Mudge Rose contends that this assumption is not only unsubstantiated but illogical: it is, they say, mathematically impossible "to ascertain confidential information concerning an individual firm when that information has been aggregated with information [about] two or more other firms." Appellant's Brief at 24–25.

■ Like Mudge Rose, we find that the rationale for the Commission's 75% and 90% nondisclosure standards is not self-evident. Consider, for example, an industry that comprises three firms, one of which produces 75% of the domestic output, another 15% and the third 10%. According to the Commission's guidelines, disclosure of the aggregate figures in such an industry would necessarily lead to disclosure of individual shares. But just how the Commission thinks such disclosure would occur eludes us. Even assuming that it is apparent to everyone that one company accounts for a major portion of the industry production, it is unclear how a party not privy to the specific company data could discern from industry-wide totals that the production breakdown among the three firms was indeed 75%–15%–10%, and not some other combination like 55%–35%–10% or 80%–15%–5%.

On the other hand, presumably it is not just information derived through the FOIA request that must be considered in assessing the perils of disclosure. That is, release of the requested aggregate information, if coupled with knowledge already publicly available about the makeup of the industry, could lead to identification of the shares of particular companies in that data. Competitors might, for example, already have a rough proxy for market shares in, say, the plant size of each firm. If this were true, then in a one or two-firm dominated market, FOIA information on industry-wide costs and profits could readily be translated into particularized information about the dominant firms. That scenario is certainly not an implausible one in the abstract.

The fact of the matter is, however, that nowhere in the record—not in the Commission's investigation report, its briefs, or in the guidelines themselves—has the Commission offered, let alone substantiated, this or any other explanation for why the 75% and 90% standards automatically guarantee exposure of individual shares in the composite industry figures. Moreover, the

affidavits of the ITC investigators do not give any specific reasons for withholding the data requested in this case. Indeed, the affidavits do nothing more than make conclusory statements that the requested data "fall within the Commission's guidelines." A. at 51, 58. Without knowing what other sources of market information (apart from the FOIA) are available to break down the aggregate data, and without the benefit of hypothetical examples or *in camera* submissions from the Commission explaining its reasons for believing revelation of the whole is equal to revelation of its parts, we are unable to discern the agency's rationale for withholding the aggregate data sought by Mudge Rose. Obviously, the Commission's judgment on the revelation potential of industry statistics is entitled to judicial deference, in light of its expertise and familiarity with the subject matter. *See CNA*, 830 F.2d at 1155–56. But deference does not mean blind acceptance. The court's reviewing authority over the legitimacy of agency withholdings demands, at a minimum, a coherent explanation of why disclosure of the requested aggregate data would identify the shares of the individual firms in it. And where, as in the present case, the Commission has neither justified its statistical formulas generally nor elaborated in its case-specific affidavits how the particular information withheld could be used alone or in conjunction with other information already known to identify the proprietary characteristics of individual firms, this court has no way to gauge the reasonableness of the agency withholding. We consequently remand to the district court for the Commission to explain its decision to withhold the aggregate data sought by Mudge Rose, either narratively or perhaps, more usefully, through a few hypothetical examples.[3]

### CONCLUSION

We agree with the district judge that § 777 of the Tariff Act qualifies as an Exemption 3 withholding statute, but conclude, in disagreement with the lower court, that the Commission has failed to provide a reasoned explanation for its determination that the aggregate data requested by Mudge Rose comes within § 777's definition of confidential business information. We therefore affirm in part, reverse in part and remand for further proceedings consistent with this opinion.

*It is so ordered.*

---

**3.** In its letter denying Mudge Rose's FOIA request, the Commission stated that the requested information fell within Exemption 4 as well as Exemption 3. Exemption 4 excepts from mandatory disclosure matters that are "trade secrets and commercial or financial information obtained from a person and privileged or confidential." 5 U.S.C. § 552(b)(4). However, as counsel for the Commission conceded at oral argument, the agency's claim that the contested aggregate data is "privileged or confidential" under Exemption 4 also presupposes that aggregate data from industries dominated by a few firms necessarily reveals confidential information about the individual firms. Because the Commission has so far failed to justify this assumption, it fails the Exemption 4 test as well.