**BANK OF AMERICA NT & SA, et al., Plaintiffs,**

v.

**Richard W. RILEY, Defendant.**

**Civil Action No. 95–1772 (JR).**

United States District Court, District of Columbia.

Sept. 30, 1996.

W. Neil Eggleston, William A. Sarraille, and Timothy K. Armstrong, Howrey & Simon, Washington, DC, for Plaintiffs.

Sheila M. Lieber and Peter Robbins, U.S. Department of Justice, Civil Division, Washington, DC, for Defendant.

## OPINION

ROBERTSON, District Judge.

Plaintiffs are nine financial institutions that hold in the aggregate about $46 billion of government-insured student loans. In this declaratory judgment action, they claim that the Secretary of Education has improperly refused to pay them approximately $16 million in statutory "special allowances" for the difference between the interest established by statute on student loans between July 1992 and January 1, 1995, and market rates of interest for the same period. They seek a judgment declaring that the Secretary's refusal, which was based on his interpretation of the Higher Education Technical Amendments of 1993, Pub.L. No. 103–208, 107 Stat. 2457, was arbitrary, capricious and contrary to law. The parties have filed dispositive cross-motions. The facts are not disputed. This memorandum sets forth the reasons for the Court's conclusion that its jurisdiction is not precluded by the anti-injunction provision of the Higher Education Act of 1965, that *Chevron* deference to the Secretary's interpretation is not required, and that the plaintiff banks are entitled to summary judgment.

## BACKGROUND

The Guaranteed Student Loan Program, now known as the Federal Family Education Loan Program ("FFEL Program" or "FFELP"), was established by the Higher Education Act of 1965. 20 U.S.C. §§ 1071–1087–2. Student loans are made by private lenders, and the government insures repayment. For the type of loan involved in this case, the Stafford Loan, 20 U.S.C. § 1071(c), the rate of interest lenders are permitted to collect from borrowers is established by statute. Until 1995, this was a fixed rate of interest.[1]

In order *inter alia* to assure lenders that their return on Stafford Loans would not be "less than equitable," 20 U.S.C. § 1087–1(a), Congress provided for "special allowances" to be paid to lenders when market rates of interest rose higher than the fixed rates at which loans could be made. 20 U.S.C. § 1087–1(b)(2)(A). In the mid–1980's, Congress balanced the "special allowances" payable in times of high market interest rates with "excess interest rebates," payable by lenders to borrowers when market rates were low. 20 U.S.C. §§ 1077a(i)(3)(B)(ii), 1077a(i)(5).[2] For borrowers, the "excess interest" rebate essentially converted fixed rate student loans to variable rate loans that mimicked fluctuations in market rates.

The excess interest rebate enacted in 1986 was to apply only to loans that were in their fifth year of repayment. The fifth year of repayment for loans issued under the 1986 amendments was 1992. In 1992, however, Congress enacted further amendments, eliminating the five-year threshold for the excess interest rebate and applying the rebate provisions to all Stafford Loans in repayment. Thus, in 1992, all Stafford Loans became eligible for the excess interest rebate at once. The Secretary of Education duly performed the calculations required by statute and determined that lenders owed rebates to borrowers for the period from July 1992 to December 1993. The lenders, however, did not pay those rebates. They asserted that their computer systems could not be adapted to do the necessary calculations.

The Higher Education Technical Amendments of 1993 at issue in this action were, among other things, a response to the technical problems the banks encountered when

1. By amendments enacted in 1986 the interest rate for Stafford Loans was fixed at 8 percent for the first four years of repayment and 10 percent thereafter. 20 U.S.C. § 1077a(d).

2. The quarterly market rate for both special allowances and excess interest rebates was a func-

tion of the "Treasury bill plus factor"—average interest rates on 91–day Treasury bills auctioned during the relevant quarter, plus a fixed number of percentage points (either 3.10 or 3.25, depending on the date the loan was issued). 20 U.S.C. §§ 1077a(i)(4)(A), 1087–1(b)(2).

attempting to administer the excess interest rebate. The "fix" for the technical problem was to compute the interest, not upon the "outstanding principal at the end of each quarter," as had been previously done, but upon the "average daily principal balance." 20 U.S.C. §§ 1077a(i)(2)(B), (4)(B).

The 1993 Amendments also amended the Treasury bill plus factor (see n. 2, supra). 20 U.S.C. § 1077a(i)(7)(B). Instead of using the current quarterly Treasury bill average (plus 3.10 or 3.25), this new formula used the previous quarter's Treasury bill average (plus 3.10 or 3.25). Id. And the 1993 Amendments provided for the conversion of all Stafford Loans so that, after conversion, their interest rates would be tied directly to fluctuations in Treasury bill rates: once a loan was converted under the 1993 Technical Amendments, there would no longer be excess interest rebates during periods of low market interest, nor (normally) would these be "special allowances" during times of high market interest.[3]

The 1993 Amendments permitted lenders to convert their existing loans from fixed to variable interest rates at their convenience, as long as the conversion was complete by January 1, 1995. 20 U.S.C. § 1077a(i)(7)(B). For the period July 1992 until the conversion date, interest rates were to be reset according to a formula:

> In connection with the conversion specified in subparagraph (A) for any period prior to such conversion, and subject to paragraphs (C) and (D), a lender or holder shall convert the interest rate to a variable rate on a loan that is made pursuant to this part and is subject to the provisions of this subsection to a variable rate. The interest rates for such period shall be reset on a quarterly basis and *the applicable interest rate for any quarter or portion thereof shall equal the sum of (i) the average of the bond equivalent rates of 91–Treasury bills auctioned for the preceding 3–month period, and (ii) 3.25 percent in the case of loans described in paragraph (1) or 3.10 percent in the case of loans described in paragraph (3)*. The rebate of excess interest derived through this conversion shall be provided to the borrower as specified in paragraph (5) for loans described in paragraph (1) or to the Government and borrower as specified in paragraph (3).

20 U.S.C. § 1077a(i)(7)(B) (emphasis added). The plaintiff banks determined that, when they converted the interest rates on their outstanding Stafford Loans according to this provision, they qualified for special allowances. At least one of the plaintiff banks applied to the Department of Education for the special allowance. The Secretary denied the application, relying on the last sentence of § 1077a(i)(7)(B) and taking the position that the "applicable rate of interest" set forth in that section was only to be used for computation of excess interest rebates for the retrospective period. This action for declaratory judgment followed.

### *ANALYSIS*

#### A. *Defendant's motion to dismiss*

█ The Secretary asserts that this Court lacks subject matter jurisdiction of plaintiffs' claim for declaratory judgment. The argument is that the relief plaintiffs seek would have essentially the same effect as an injunction and is thus precluded by § 432(a)(2) of the Higher Education Act of 1965, which prohibits the issuance of an "attachment, *injunction,* garnishment, *or other similar process* ... against the Secretary or property under the Secretary's control...." 20 U.S.C. § 1082(a)(2) (emphasis added).

Three of the four courts that have considered the Secretary's position have concluded that declaratory relief is not precluded by the HEA. *Student Loan Marketing Assoc. v. Riley,* 907 F.Supp. 464, 474 (D.D.C.1995), (Sporkin, J.) (*appeal docketed*); *Thomas v. Bennett,* 856 F.2d 1165, 1168 (8th Cir.1988), (*superseded by statute on other grounds, see* 20 U.S.C. § 1091a); *Pro Schools, Inc. v. Riley,* 824 F.Supp. 1314, 1315–16 (E.D.Wis. 1993) (claim for declaratory relief allowed after dismissing claim for injunction). The Secretary, however, chooses to rely on the fourth case, an unreported decision from the

---

**3.** Special allowances would still be payable if and when market rates exceeded the statutory cap on interest rates. *See* 20 U.S.C. §§ 1077a(d), (i)(7)(D).

District of Idaho, *Student Loan Fund of Idaho, Inc. v. Riley*, No. CV94–0413–S–LMB (Sept. 14, 1994). In that case the district court held that § 432(a)(2) precludes claims for declaratory relief the court relied, as the Secretary does here, on *California v. Grace Brethren Church*, 457 U.S. 393, 102 S.Ct. 2498, 73 L.Ed.2d 93 (1982).

In *Grace Brethren Church*, the Supreme Court found that injunctions and declaratory judgments are similar processes *for purposes of the Tax Injunction Act.* The decision focuses on the unique federalism issues in the relationship between the state and federal tax systems, observing that "Congress' intent in enacting the Tax Injunction Act was to prevent federal court interference with the assessment and collection of state taxes." *Id.* at 411, 102 S.Ct. at 2509. The Court found that Congress intended "to limit drastically federal district court jurisdiction to interfere with so important a local concern as the collection of taxes," *id.* at 409, 102 S.Ct. at 2508 (*quoting Rosewell v. LaSalle National Bank*, 450 U.S. 503, 522, 101 S.Ct. 1221, 1233–34, 67 L.Ed.2d 464 (1981)), and it further observed that relief was available to the plaintiff in state courts. The Court concluded that Congress intended in the Tax Injunction Act to prohibit all forms of "anticipatory relief against state tax officials" in the federal courts. *Grace Brethren Church*, 457 U.S. at 409, 102 S.Ct. at 2508. The instant case, by contrast, presents no federal-state conflict, nor is the relief sought by these plaintiffs "anticipatory" in the sense the declaratory relief sought in *Grace Brethren Church* was "anticipatory." The Supreme Court's decision in *Grace Brethren Church* does not control the application of § 432(a)(2) of the HEA in this case.

The differences between actions for declaratory judgment and for injunction have been long recognized. *See* Edwin Borchard, Declaratory Judgments 365–67 (2d ed.1941). Both actions may determine the rights of the parties, but "the occasional suggestion that a declaratory judgment would issue only where an injunction would have been proper is unjustified. . . ." *Id.* at 365, n. 94. There is no indication in the HEA, and none has been cited from its legislative history, that Congress intended to eliminate *all* federal jurisdiction by the enactment of § 432(a)(2).[4] The motion to dismiss for want of subject matter jurisdiction must be denied.[5]

B. *Cross-motions on the merits*

▮ The Secretary bases his denial of plaintiffs' demand for special allowances upon his interpretation of the statutory term "applicable rate of interest." He has concluded, and urges the Court to find, that the "applicable rate of interest" set forth in the retrospective conversion provision quoted above, 20 U.S.C. § 1077a(i)(7)(B), is "applicable" only for calculating excess interest rebates. He contends that the "applicable rate of interest" for calculating special allowances during the retrospective period is different: that, for special allowance purposes, the "applicable rate of interest" remains the fixed

---

**4.** Indeed, Congress clearly contemplated the possibility of actions for breach of contract: "The holder of an eligible loan shall be deemed to have a contractual right against the United States, during the life of such loan, to receive the special allowance according to the provisions of this section." § 1087–1(b)(3).

**5.** The discretionary nature of declaratory relief makes it appropriate to consider, not only the jurisdictional question presented by the government's motion, but also whether the issuance of declaratory relief in this case would serve a useful purpose. *See Penthouse International, Ltd. v. Meese*, 939 F.2d 1011, 1020 (D.C.Cir.1991), and cases there cited. *See also* 6A Moore's Federal Practice ¶ 57.05 (1996). The "bottom line" of the claim at bar is that the Secretary of Education owes plaintiffs $16 million in special al-

lowances. But, of course, money claims against the United States for breach of contract must be brought in the U.S. Court of Claims, see 28 U.S.C. §§ 1346(a)(2), 1491, and, should further proceedings be necessary to prosecute the claims of individual banks, those claims would not lie here. Nevertheless, government counsel indicated at oral argument that the likelihood of government nonacquiescence in the final outcome of this action is remote. For that reason, and because the immediate question before the court is one of pure statutory construction, it appears that declaratory relief would indeed serve a useful purpose. *See* Borchard, Declaratory Judgments at 788 ("The construction and interpretation of statutes and ordinances and the question of their application . . . is a common quest of declaratory action").

rate established in 1986 by 20 U.S.C. § 1077a(d).

The banks, for their part, assert that § 1077a(i)(7)(B) unambiguously required that the "applicable rate of interest" for Stafford Loans be reset for the entire conversion period and that the 1993 Technical Amendments neither repealed nor modified the "special allowances" whose existence they relied upon in making the student loans in the first place.

■ The analysis required of a court called upon to review an agency's interpretation of a statute it administers is prescribed by *Chevron v. Natural Resources Defense Council*, 467 U.S. 837, 842–43, 104 S.Ct. 2778, 2781–82, 81 L.Ed.2d 694 (1984).

> "If the Congress has 'directly spoken to the precise question at issue,' the Court 'must give effect to the unambiguously expressed intent of Congress'; if, however, the statute is silent or ambiguous on the question at issue, then the Court will defer to the agency's interpretation if it is permissible in light of the structure and purpose of the statute."

*First Nat. Bank & Trust v. Nat'l Credit Union*, 90 F.3d 525, 527 (D.C.Cir.1996), quoting *Chevron*.

The *Chevron* analysis in this case begins with the language of the statutory provision for special allowances, which was not changed by the 1993 Amendments:

> "The special allowance paid pursuant to this subsection on loans shall be computed (i) by determining the average of the bond equivalent rates of 91–day Treasury Bills auctioned for such 3–month period, (ii) by subtracting the *applicable interest rate* on such loans from such average, (iii) by adding 3.25 percent [Or 3.10 percent] to the resultant percent, and (iv) by dividing the resultant percent by 4."

20 U.S.C. § 1087–1(b)(2)(A). (Emphasis added.) Before the enactment of the 1993 Amendments, there was no question of how that provision should be applied: the "applicable interest rate" was that set forth in 20 U.S.C. § 1077a(d), 8 percent from the date of disbursement until four years after the commencement of repayment and 10 percent thereafter. The Secretary's position is that,

after the 1993 Amendments, the computation for special allowances during the retrospective period must still be done at 8 percent and 10 percent, even though the actual rate of interest on the loans for that retrospective period was reset by operation of the 1993 Amendments. The Secretary's argument is that the 1993 Amendments introduced ambiguity into the statute, that he has the duty to interpret in the face of that ambiguity, and that his interpretation is reasonable.

This is a good point at which to invoke a corollary to the *Chevron* rule, recited in the Court of Appeals' recent decision in *First Nat. Bank & Trust, supra*, 90 F.3d at 527: "[I]n resolving the threshold question whether Congressional intent is sufficiently clear ... to review the case under step 1 of *Chevron*, 'we are not required to grant any particular deference to the Agency's parsing of statutory language or its interpretation of legislative history,'" *citing Rettig v. Pension Benefit Guaranty Corp.*, 744 F.2d 133, 141 (D.C.Cir.1984). For, on its face, § 1077a(i)(7)(B) as enacted by the 1993 Technical Amendments is unambiguous. It requires lenders, upon converting their outstanding Stafford Loans from fixed to variable interest rates, to "reset" the interest rates on a quarterly basis to a *new* "applicable interest rate." It is not suggested on this record the same loan can bear two different interest rates at the same time. Thus, for purposes of applying the special allowance formula set forth in § 1087–1(b)(2)(A), the "applicable interest rate" for the period from July 23, 1992 until conversion is the "applicable interest rate" now mandated by § 1077a(i)(7)(B) for that conversion period. The Secretary's "parsing" of the language of the statute is not convincing, or is his effort to marshal legislative history hinting at a Congressional motive for treating special allowances differently from excess interest rebates.

The normal, natural reading of the statute leaves no ambiguity. This case can and should be resolved under *Chevron* step one. The "applicable interest rate" for calculating any special allowances due to Stafford Loan lenders during the conversion period is that set forth in § 1077a(i)(7)(B). The Secretary's different interpretation is not owed *Chevron* deference.

A look at the practical application of the Secretary's interpretation shows why, in any event, that interpretation would not be a permissible one "in light of the structure and purpose of the statute." *First Nat. Bank & Trust, supra.* As plaintiffs point out, Memorandum, p. 12, Treasury bill rates rose through the last six quarters of the retrospective period established by § 1077a(i)(7)(B). Thus, for example, the Treasury bill rate in the fourth quarter of 1994 was 5.46 percent, but the fourth quarter interest rates were reset for Stafford Loans to include the *third* quarter rate of 4.63 percent. When borrower rates lagged behind current rates, the result was a retroactive cut in plaintiffs' yields on the loans they made in reliance upon the special allowance provisions that existed before enactment of the 1993 Amendments.

Plaintiffs overstate their case when they insist that they enjoy a guaranteed minimum return on Stafford Loans, *e.g.,* Reply at 4, but they are persuasive when they point out that the legislative history of the 1993 Amendments, such as it is, provides no support for an interpretation that would operate retroactively to *reduce* their loan yields. They refer to comments made in the House by Representatives Goodling and Ford, to the effect that the 1993 Amendments were intended to be only "technical" in nature, 139 Cong. Rec. E–2556, E–2549 (Daily Ed. Oct. 27, 1993), and they rely upon court decisions observing that technical amendments are generally assumed to be non-substantive. See *Alabama Power Co. v. Costle,* 636 F.2d 323, 401 n. 49 (D.C.Cir.1979). See also *Mudge Rose Guthrie Alexander & Ferdon v. U.S. ITC,* 846 F.2d 1527, 1529 n. 1 (D.C.Cir. 1988). A fair summary of the history of the Stafford Loan program would acknowledge that loan yields have been stable, if not (as plaintiffs suggest) sacrosanct. A decision by Congress to cut them, and especially to cut them retroactively, would certainly have been a "substantive" and not a technical one.

Nor is there any evidence in the legislative history to support the Secretary's suggestion, Memorandum p. 11, that treating special allowances differently from excess interest rebates is reasonable as a kind of rough-justice way of redressing "the problem of the unpaid rebates that had been accumulating since July 23, 1992 ... and would continue to accumulate up to the date of conversion because of the lenders' purported inability to make all the necessary calculations."

An appropriate order accompanies this opinion.

### *ORDER*

For the reasons stated in the accompanying memorandum, it is this 3rd day of September, 1996,

**ORDERED** that Plaintiffs' motion for summary judgment [# 19] is **GRANTED,** and the Clerk is directed to enter judgment for plaintiffs declaring that the final decision of the Secretary of Education made in October 1994 and confirmed thereafter on January 9, February 22 and March 5, 1995, denying special allowances to holders of FFELP loans for the retrospective period established by 20 U.S.C. § 1077a(i)(7), was contrary to law. It is

**FURTHER ORDERED** that defendant's motion for summary judgment [# 20] is **DENIED.** And it is

**FURTHER ORDERED** that plaintiffs' motion for leave to file surreply memorandum [# 29] is **DENIED.**